Avner M. HORTON, Appellant,

v.

UNITED STATES STEEL CORPORATION, Appellee.

No. 18367.

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1961.

John A. Jenkins, Birmingham, Ala., for appellant.

Andrew J. Thomas, Birmingham, Ala., Moore, Thomas, Taliaferro, Forman & Burr, Birmingham, Ala., of counsel, for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The only new twist in this case involving a veteran's reemployment after return from military service [1] is whether *transfer* to other available work is to be treated as in the case of *promotion*. In the latter situation promotion must be an automatic right from seniority or time alone with no possibility of loss through proficiency tests or other managerial discretionary selection. McKinney v. Missouri-Kansas-Texas Railroad Company, 1958, 357 U.S. 265, 78 S.Ct.

1222, 2 L.Ed.2d 1305. The District Court held that both were to be considered alike. On that premise it further concluded that the prospect of transfer, while substantial in a practical sense was not positively assured either under the collective bargaining agreement or the custom and practice followed by the employer, and consequently the employee did not have a right to reinstatement or back pay. We agree.

The facts concerning Horton, the employee, are very simple. On January 19, 1952, he entered the military service. At that time he worked for this employer at the Edgewater Coal Mine on the "owl" shift as sludge tank tender. He did not return from military service until November 9, 1953. On his departure his position was first filled by Harrison and thereafter by Dougherty when Harrison was advanced to another job. During his absence the entire owl shift was laid off on April 18, 1953, due to reduction in operations. None of the men in the owl shift was then assigned to jobs similar or junior to Horton's former owl-shift position on the remaining shifts. And no claim is made by the employee here that he was entitled as of that time to any jobs similar or junior to his former owl-shift position on the remaining shifts.

What happened, and what gives rise to this employee's claim, was that a substantial number of the owl shift thus laid off were given employment at other installations of the employer as a result of being placed on the unemployment panel pursuant to the seniority rules. In short, the employee's theory is that had he been present on April 18, 1953, at the time of the owl shift layoff, he, as was true of a majority of the owl shift, would have been given employment by the employer at other installations. Therefore, since he was absent for military duty and could not take advantage of this opportunity, he has suffered a disadvantage as a direct consequence of military service and is entitled to be restored

1. 50 U.S.C.A.Appendix, § 459 (1951).

to like position. To succeed the employee has to maintain this thesis since it is uncontradicted that on his return from military duty November 11, 1953, the owl shift at Edgewater was still laid off. It was not until May 1955 when it was re-established that the employee resumed his former job and that soon terminated in December 1955 when the owl shift was again laid off.

Under the applicable collective bargaining agreement which has substantial, if not decisive, significance in determining whether discrimination has been practiced, Poore v. Louisville & Nashville Railroad Company, 5 Cir., 1956, 235 F.2d 687, 689, the employer maintained each installation as a completely separate activity. For reasons satisfactory to the employer and to all of its employees generally, each unit was considered separately for promotion, seniority, bargaining and related purposes. Specifically a man at Edgewater Mine, whatever might be his seniority or standing, had no right to any job at another installation such as Short Creek Mine. Loss, or threatened loss, of his job gave him no rights to require that a person junior to him in company service but working at a different installation would first be laid off. However, to alleviate hardships occasioned by layoffs, the seniority rule promulgated pursuant to the collective bargaining agreement gave such employees a substantial protection. The rule[2] required that the employer maintain a central unemployment panel of names of those laid off. This panel would constitute a list from which "additional employees shall be selected" by the employer.

Arguing that the seniority rule, note 2, supra, either on its face or in the context of the custom and practice regularly followed by the employer assured him substitute work, the employee insists that had he been there on April 18, 1953, he would have been transferred and consequently what would have happened is deemed to have happened as things move upward and forward on the veterans reemployment escalator. Moe v. Eastern Air Lines, 5 Cir., 1957, 246 F.2d 215, 221; Fishgold v. Sullivan Drydock & Repair Corp., 1946, 328 U.S. 275, 284–285, 66 S.Ct. 1105, 90 L.Ed. 1230. A good deal of support for this argument is found in the fact that of some 20 men on the owl shift a majority were shortly reemployed in new activities at installations other than Edgewater. This included specifically Harrison and Dougherty. In the same direction is the imperative language of the rule that displaced employees on the panel "shall constitute a panel from which additional employees shall be selected." But the word "shall," emphatic as it normally is, cannot be wrenched from its industrial setting. Moreover, the rule uses another term envisaging a final discretion in the employer as to whom it would choose. For the rule states that the panel shall constitute a list from which additional employees shall be *selected*.

The conclusion that the contract rule does not guarantee an automatic right of first available reemployment at other installations still leaves open the question upon which McKinney was remanded for further proceedings. 357 U.S. at page 274, 78 S.Ct. at page 1227. That is the question whether, despite an equivocal formal contractual rule ostensibly leaving final choice to the employer's selection, the custom and practice uniformly followed accorded automatic promotion (or transfer) as a right in fact.

█ On this the District Court heard much testimony and made precise fact

2. The rule provided: "Employees displaced because of new mining methods, installation of new mechanical equipment or cutting off of a shift, shall constitute a panel from which additional employees shall be selected, provided such employees have reported to the mine man-agement their desire for such employment and such employees are available for work within 3 days after notification by the Company. A copy of such notification shall be furnished to the mine committee."

findings which come here well armed with the buckler and shield of F.R.Civ.P. 52(a), 28 U.S.C.A. Rea Construction Co. v. B. B. McCormick & Sons, 5 Cir., 1958, 255 F.2d 257. Not only is there substantial evidence in support of these findings, but we think no satisfactory showing to the contrary was made bringing into question to any degree the full acceptance of the testimony given by responsible personnel representatives of the employer. While each acknowledge the perfectly obvious fact that an employment record attesting to faithful competent performance of work[3] would be highly persuasive and of considerable value in choosing men from the unemployment panel, it was uncontradicted that, in the final analysis, the choice was left to the superintendent of the other, i. e., "hiring," installation. That superintendent, influenced as he might be by the recommendation of the releasing installation or by the prospect's own service record itself, had yet to determine whether he would take such person rather than another or for that matter a wholly new applicant. In that process, it was usual to have a personal interview—a circumstance which in itself negatives the guaranty of an absolute right to transfer to substitute employment.

We can agree with the employee that the transfer of Harrison and Dougherty to substitute jobs from the unemployment panel illustrates that there is a very substantial likelihood that had he been in civilian employment in April, 1953, he, too, would have been given substitute employment. But more than a high probability is required. Paraphrasing McKinney, the employee "could not have demanded * * *" that the employer hire him at another installation. Employment at another installation was "not dependent simply on seniority. * * *" It was "dependent on fitness and ability and the exercise of a discriminating managerial choice. * *"

It is not enough that "in his absence" on military service some employees were selected from the unemployment panel "and if he had then been [in civilian service] he might have applied for it, and [the Employer] might have found that he possessed the requisite fitness and ability." 357 U.S. 265, at page 272, 78 S.Ct. 1222 at page 1227.

To our statement that "Only where the promotion or advancement is *automatic* can the veteran claim his right," Bassett v. Texas & Pacific Railway Co., 5 Cir., 1958, 258 F.2d 819, 823, may now be added *transfer*. There was no automatic assurance that had he been present he would have been transferred. He had no enforceable right to demand that this be done. It was that which the Act undertook to protect and in the absence of it there is no right to relief. Sularz v. Minneapolis, St. Paul & Sault Ste. Marie R. Co., 8 Cir., 1958, 259 F.2d 122; Poore v. Louisville & Nashville R. Co., 5 Cir., 1956, 235 F.2d 687, 692.

Affirmed.

---

3. The employer required the foremen to rate their men. Horton had been rated as the second most efficient man on his shift.