William CHAUSSEE, as Conservator
for Toby Ramsland, Plaintiff
and Appellant,

v.

Elvira THIEL and Mary A. Schirado, aka
Allison Schirado, as Personal Represen-
tative for the Estate of Lester Schirado,
Defendants and Appellees.

Civ. No. 930225.

Supreme Court of North Dakota.

Aug. 24, 1994.

Austin G. Engel (argued), of Webster &
Engel, Bismarck, for plaintiff and appellant.

Benjamin C. Pulkrabek (argued), Mandan,
for defendant and appellee Elvira Thiel.

Sean O. Smith (argued), of Tschider &
Smith, Bismarck, for defendant and appellee
Mary A. Schirado.

NEUMANN, Justice.

William Chaussee, as conservator of Toby
Ramsland, has appealed a district court judg-
ment entered in his action to set aside deeds
conveying interests in real property to Elvira
Thiel; for the return of other property to
Toby Ramsland; for payment to Toby of the

proceeds of any lease or sale of farmland by Thiel; and for damages, costs, disbursements, and attorney fees from Thiel and Lester Schirado. We affirm and remand with directions.

On July 27, 1989, Ole Ramsland died testate, leaving all of his property, which included 800 acres of farmland, a house, a mobile home, and three lots in Almont, to his only surviving brother, Toby Ramsland. Ole's will appointed Toby as the personal representative of the estate. On August 2, 1989, Toby, with the assistance of his attorney, Lester Schirado, was issued letters testamentary appointing him personal representative of the Ole Ramsland Estate. Toby also executed that day a durable power of attorney naming Elvira Ramsland Thiel, a second cousin who often provided him with transportation and other assistance, as his attorney-in-fact to assist him in carrying out his duties and responsibilities as personal representative of the Ole Ramsland Estate.

On September 18, 1989, Toby requested Schirado to prepare an instrument transferring a mobile home from the Ole Ramsland Estate to Thiel. On that same day, Schirado prepared and Toby executed a personal representative's deed of distribution conveying to Thiel the following:

"... certain real property hereinafter described from the estate of said decedent:
"A 1968 Detroiter mobile home, Serial No. DM 6905, situated on Lots Four (4), Five (5), and Six (6) in Block Ten (10) in Filkins First Addition to the City of Almont, North Dakota."

On June 6, 1990, Toby again visited Schirado and executed a renunciation of his interest in the farmland in the Ole Ramsland Estate and executed a personal representative's deed conveying the farmland in the Ole Ramsland Estate to Thiel.[1]

On September 12, 1991, the Morton County Court appointed Chaussee as conservator of Toby's property. In December 1991, Chaussee commenced this action against

Thiel and Schirado. Thiel and Schirado answered the complaint. In addition, Schirado counterclaimed for libel. Trial of the action resulted in a judgment decreeing that Chaussee had abandoned his allegations of fraud; setting aside the personal representative's September 18, 1989, deed of distribution, on the ground that the parties had operated under the mutual mistake of fact that the mobile home was not permanently attached to the real estate and that Toby executed the deed under the mistake of law that he was gifting the mobile home to Thiel without any associated real estate; upholding the June 6, 1990, personal representative's deed conveying the farmland to Thiel, subject to reimbursement to Toby for taxes he had paid after June 6, 1990; dismissing Schirado's counterclaim; and awarding Chaussee costs and disbursements against Schirado in the amount of $557.25.

Among the trial court's findings of fact are the following:

"4. Toby Ramsland has developed and attached special significance to his military service and the veterans benefits he earned as a result thereof. It is clear that the transfer of title from Toby Ramsland, Ben Ramsland and Fred Ramsland to Ole Ramsland, as occurring on July 24, 1978, served two fundamental purposes. The first to allow Ole Ramsland to be the unofficial business manager of the Ramsland family farm and secondly to allow Toby Ramsland to continue to receive his veterans benefits pension.

\*　　\*　　\*　　\*　　\*　　\*

"10. Toby Ramsland was born on March 10, 1907. He graduated from high school, attended college and thereafter became a school teacher prior to serving in the United States Armed Forces and ultimately returning to join in the operation of the Ramsland family farm. Toby Ramsland is considered to be an intelligent and well read man, capable of making his independent decisions concerning his own busi-

---

**1.** We note that personal representatives normally do not have authority to make gifts of estate assets. *See* § 30.1–18–15(6), N.D.C.C., (personal representatives may dispose of assets "for cash or on credit") and § 30.1–18–15(23), N.D.C.C., (personal representatives may sell any property of the estate "for cash, credit, or for part cash and part credit"). Here, however, there were no creditors or heirs other than Toby to object, and the issue was not raised below or on appeal.

ness affairs. During Toby Ramsland's joint residency with Ole Ramsland, Ole Ramsland did perform many of the business tasks associated with the operation of the Ramsland family farm, but did so only after discussions between Ole Ramsland and Toby Ramsland. On August 2, 1989, at the age of 82 years, Toby Ramsland was considered by all to be fully capable of conducting his personal and business affairs with knowledge and understanding of his actions.

\* \* \* \* \* \*

"12. Toby Ramsland was no more dependent upon Defendant Schirado than any other client. Toby Ramsland specifically requested Defendant Schirado to prepare each of the deeds which are the subject matter of this action, absent any undue influence by Defendant Schirado.

"13. At the time of trial Toby Ramsland continues to have full capacity to understand the contents of each of said deeds. Even though Toby Ramsland now testifies that it is not now his intention to gift said property to Defendant Thiel, it is clear that on each of September 18, 1989, and June 6, 1990, Toby Ramsland understood the contents of each of said deeds, requested preparation of the same and did execute each of said deed freely, knowingly and voluntary.

\* \* \* \* \* \*

"18. The evidence before the Court herein demonstrates that on each of September 18, 1989, and June 6, 1990, Toby Ramsland as personal representative of the estate of Ole Ramsland, was competent to act in that capacity, and that his execution of each of said personal representative's deeds was a free and knowing act by Toby Ramsland, absent any exercise of undue influence by either the Defendant Thiel or the Defendant Schirado."

Chaussee asserts that findings 10, 12, 13, and 18 are clearly erroneous or inconsistent with other findings.

■ Our review of findings of fact is limited by Rule 52(a), N.D.R.Civ.P. In reviewing findings of fact, the evidence must be viewed in the light most favorable to the

findings. *Layman v. Braunschweigische Maschinenbauanstalt, Inc.*, 343 N.W.2d 334 (N.D.1983). Findings of fact are presumptively correct. *Dschaak v. Dschaak*, 479 N.W.2d 484 (N.D.1992); *Alumni Ass'n of Univ. v. Hart Agency, Inc.*, 283 N.W.2d 119 (N.D.1979). A party challenging a finding of fact on appeal bears the burden of demonstrating that the finding is clearly erroneous. *Dick v. Dick*, 414 N.W.2d 288 (N.D.1987); *Routledge v. Routledge*, 377 N.W.2d 542 (N.D.1985). A finding of fact is clearly erroneous only when the reviewing court, upon review of the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Dick v. Dick, supra.* "We will not determine that the district court's findings are clearly erroneous merely because we may have viewed the facts differently had we been the trier of fact." *Giese v. Morton County*, 464 N.W.2d 202, 203 (N.D. 1990). A choice between two permissible views of the evidence is not clearly erroneous. *Gillmore v. Morelli*, 472 N.W.2d 738 (N.D.1991).

■ No productive purpose would be served by detailing all of the evidence supporting the challenged findings of fact. Toby was proud of his military service. Toby attached a special significance to his veteran's pension and its continued receipt was very important to him. Retention of the farmland received under Ole's will would have resulted in the termination of Toby's veteran's pension under 38 U.S.C.A. §§ 1521, 1522. 38 U.S.C.A. § 1521 provides that a veteran's pension shall be "reduced by the amount of the veteran's annual income." Such a dollar-for-dollar reduction due to income from the farmland would have terminated Toby's veteran's pension. 38 U.S.C.A. § 1522(a) provides:

"The Secretary shall deny or discontinue the payment of pension to a veteran under section 1521 of this title when the corpus of the estate of the veteran or, if the veteran has a spouse, the corpus of the estates of the veteran and of the veteran's spouse is such that under all the circumstances, including consideration of the annual income of the veteran, the veteran's spouse, and the veteran's children, it is reasonable that

some part of the corpus of such estates be consumed for the veteran's maintenance." The evidence presented at trial indicated that Toby's receipt of farmland valued at $100,000 or more at the age of 82, with no spouse or children, would almost certainly have resulted in termination of his veteran's pension. Toby had in the past avoided termination of his pension upon receiving an interest in the farmland upon the death of a brother by conveying his interest away. Toby's actions in this case were consistent with his past practice of retaining his pension by conveying away any interest he received in the farmland. Our review of the entire evidence has not left us with a definite and firm conviction that a mistake has been made. The trial court's findings of fact are, therefore, not clearly erroneous. We also do not find any fatal inconsistencies in the findings.

Chaussee argues that the trial court's findings are unclear on the issue of undue influence and incomplete as to other matters. With regard to undue influence, Chaussee argues:

"At its finding No 18 and also at finding No. 12, the Trial Court states its finding and then ends with the strange and cryptic language, '... absent any exercise of undue influence by either Defendant Thiel or the Defendant Schirado.', at No. 18, and: ... absent any undue influence by Defendant Schirado.' at finding No. 12. What does this language mean?

"That the prior statements are true *if* there is no undue influence? Or that the prior statements are true *because* there is no undue influence? ... The phrases certainly are not clearcut and forthright findings that there was no undue influence."

Upon viewing the evidence in the light most favorable to the trial court's findings of fact and considering all of the findings and conclusions together, it appears to us that the trial court found that there was no undue influence exercised upon Toby by either Thiel or Schirado.

Chaussee contends that the trial court erred in concluding that he abandoned his fraud claims and erred in failing to make findings and conclusions on his allegations of constructive fraud against Thiel. Chaussee has not drawn our attention to anything in the record that compels the conclusion that the trial court erred. All that has been shown is that Chaussee and the trial court had different views of the case. It is inconceivable that the trial court, which found that there was no undue influence exercised by Thiel and found that there was no evidence of a mutual mistake of fact or law, could be persuaded on this record that there was, nevertheless, constructive fraud. We will, therefore, not remand for further findings regarding Chaussee's claim of fraud.

We have considered the other issues raised by Chaussee and have determined that they are without merit. Chaussee and the trial court viewed the evidence very differently. From our review of the record, we have not been left with a definite and firm conviction that a mistake has been made with regard to the findings of fact, which are, therefore, not clearly erroneous, and we have not been persuaded that the trial court committed any reversible errors of law.

We are, however, concerned about what will happen if Toby suffers a loss in income, such as the possible loss of his veteran's pension. As the trial court specifically determined with regard to Toby's gift of the farmland to Elvira:

"Toby Ramsland's motivation to make said gifts was to preserve his status as a recipient of his veteran's benefit pension. Toby Ramsland further believed that the Defendant Thiel would provide for Toby Ramsland for the rest of his life, much as his brother had previously."

There is no formal security for Toby's belief that Elvira would provide for him for the rest of his life. Although not cited by the parties in this appeal,[2] the imposition of a trust in the income from the farmland during Toby's lifetime under §§ 59–01–05,[3] and 59–01–06,[4]

2. We "conduct appellate review 'in light of all relevant precedents, not simply those cited to or discovered by the district court.' " *State v. Larsen*, 515 N.W.2d 178, 182 (N.D.1994), *quoting Elder v. Holloway*, 510 U.S. ——, ——, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344, 348 (1994).

3. Section 59–01–05, N.D.C.C., provides:
   *"59–01–05. Implied trust—Definition.* An implied trust is one which is created by operation by law."

4. Section 59–01–06, N.D.C.C., provides:

N.D.C.C., or the imposition of such a trust to take effect if the need for one should arise due to a change in Toby's income, might be appropriate. Such a trust in the income from the farmland during Toby's lifetime would give Elvira the land and its income after Toby's death, as Toby wished, would secure Toby's expectation that Elvira would provide for him for the rest of his life, and fulfill Elvira's promise to give Toby "enough money."

The judgment is affirmed and the matter is remanded to the trial court with directions to stay the judgment until the trial court has determined whether or under what conditions to impose an implied trust on the income from the farmland during Toby's lifetime. We express no view on the merits of the issue.

VANDE WALLE, C.J., and LEVINE and SANDSTROM, JJ., concur.

MESCHKE, Justice, concurring.

I concur in remanding "with directions to stay the judgment until the trial court has determined whether or under what conditions to impose an implied trust on the income from the farmland during Toby's lifetime," but I vote to direct that relief be granted unless some valid defense exists that has not been argued on this appeal. I write separately to state my view of the record and my reasons for voting to direct the imposition of an implied trust.

Four bachelor Ramsland brothers together outlived their parents on the family farm near Almont. Aging Toby Ramsland became, at 82 years, the sole survivor when his last brother, Ole Ramsland, died on July 27, 1989. Ole's will left all of the family's accumulated property to Toby and named Toby the personal representative to administer the estate. It was all too much for Toby, and he turned to others for help.

Until Ole's death, Toby had kept no ownership in the family farm, nor in the home that he shared with Ole in Almont. Toby subsisted, instead, on a $9,000 annual income, combined from social security and a veterans pension of $367 per month. As his parents and the other brothers had passed on, Toby and the brothers had surrendered and transferred their inherited property to Ole, who took care of them. This arrangement had "two fundamental purposes," according to the trial court's findings, "to allow Ole ... to be the unofficial business manager of the Ramsland family farm," and "to allow Toby ... to continue to receive his veterans benefits pension." Toby had "developed and attached special significance to his military service and the veterans benefits he earned as a result thereof." After Ole died, Toby was alone, adrift, and turned for help to a longtime neighbor, one of his many second cousins, Elvira Thiel. She tried, but it was not the same as with Ole.

On August 1, 1989, Elvira and her husband took Toby to a New Salem bank, opened Ole's safety deposit box there, and co-signed a loan with Toby so he could pay Ole's funeral expense. They found in the box 118 gold coins that Toby later gave to Elvira, upon her suggestion to cancel the box.

On August 2, 1989, Elvira took Toby to attorney Lester Schirado's office. Schirado prepared, and Toby signed, an application to name Toby personal representative of Ole's estate; a will that left all of Toby's property to Elvira; and a general durable power of attorney to Elvira with specific power to

---

"59–01–06. *Implied trust—How created.* An implied trust arises in the following cases:

"1. One who wrongfully detains a thing is an implied trustee thereof for the benefit of the owner.

"2. One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it.

"3. Each one to whom property is transferred in violation of a trust holds the same as an implied trustee under such trust, unless he purchased it in good faith and for a valuable consideration.

"4. When a transfer of real property is made to one person and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

assist Toby in administering Ole's estate. On September 18, 1989, Toby asked Schirado to document a transfer to Elvira of a 1968 Detroiter mobile home located adjacent to Ole and Toby's residence. Schirado prepared, Toby executed, and someone recorded an estate "deed of distribution" that transferred not only the mobile home, but also all three lots that included its location and the residence where Toby lived. Toby continued to live in the residence.

According to the trial court's decision, Toby executed the September 18 deed "under the mistake of law that he was gifting to Elvira Thiel one 1968 Detroiter mobile home absent any associated real estate," and the deed "failed to properly reflect the express intent of the donor and grant[or], Toby Ramsland." The trial court set aside this September 18 deed, and Thiel did not appeal that decision. Even though the judgment does not say so, the trial court's ruling leaves the movable mobile home in Elvira's name, from her registration of the title certificate in her own name in 1992 before the trial.

Schirado did more legal work for Toby that, for whatever reason, primarily benefitted Elvira Thiel without protecting Toby. The conservator identifies a possible reason. In early 1990, Elvira's husband died, and Schirado represented Elvira in probating her husband's estate. Schirado billed Elvira for his work on her husband's estate in July 1990. Although the trial court made no explicit finding on the subject, it is apparent that Schirado's work for Toby mostly benefitted Elvira, not Toby. Interestingly, the trial court assessed costs and disbursements "against only the Defendant Schirado."

On June 6, 1990, Elvira took Toby to Schirado's office again, where Schirado prepared two more documents that Toby signed: a renunciation of all interest in the 800 acres of Ramsland farmland, and an estate "deed of distribution" giving the 800 acres to Elvira. This deed was kept unrecorded in Schirado's file. The trial court expressly determined:

> Toby Ramsland's motivation to make said gifts was to preserve his status as a recipient of his veteran's benefit pension. Toby Ramsland further believed that [Elvira] Thiel would provide for Toby Ramsland for

the rest of his life, much as his brother had previously.

Believing that he still controlled the farmland, Toby took the fall 1990 cash rent for the land, paid the 1990 real estate taxes in January 1991, and took the spring 1991 cash rent for the land. In the spring of 1991, Toby signed the land up with the ASCS, but thereafter Elvira Thiel had Schirado write the renters to pay her directly.

Erwin Thiel, an old friend and neighbor of Toby's, had rented and farmed 240 acres of the Ramsland farm for fifteen years. In the fall of 1990, Erwin began to negotiate with Toby to buy those acres. Erwin testified:

> We were at his office twice and talked about, that was Toby and I, and uhm, we weren't really getting anywhere. So, one time I was in Mandan by myself and I stopped in at [Schirado's] office and talked to him about this and then Mr. Schirado said that, he said Toby can't sell you this land because he doesn't own it. He said it was, it was Ole's wishes to give it all to Elvira.

On September 24, 1990, Schirado wrote Toby:

> I had checked through Ole's estate file, and it was determined that the land which you wished to sell to Ervin was previously transferred to Elvira, to protect your Veterans' Administration benefits. Thus, if you were to sell the land to Ervin at this time, it would appear that you would be losing your Veterans' Administration benefits.

Yet, Schirado did not record Toby's deed to Elvira of the 800 acres until March 11, 1991. Then, because "Toby wanted me to," Elvira sold the 240 acres to Erwin in April 1991 by contract for deed. Elvira received a $6,000 downpayment on a $30,000 price with the balance payable over ten years at 9½% interest to her. Afterward, Toby thought, "I should have gotten the money" that Elvira received for the downpayment. Evidently, Toby came to believe that he couldn't trust Elvira to "provide for [him] for the rest of his life, much as his brother had previously."

Toby went to attorney Austin G. Engel, who had represented Erwin Thiel in purchas-

ing the 240 acres. On May 9, 1991, Toby had Engel prepare a new will that Toby executed. Toby's new will gave all his property to Erwin Thiel and his wife, Nancy; granted his other farm tenant, Jake Larson, an option to purchase the remaining 560 acres of farmland at fair market value; and appointed Nancy Thiel as his personal representative.

Concerned that "Toby wasn't, didn't seem to be able to function and handle things or he wasn't handling things very well," Ronald Otto, the Morton County veteran's service officer petitioned the Morton County Court on July 2, 1991 to appoint a conservator for Toby. Elvira Thiel, represented by Schirado, resisted the appointment. On September 12, 1991, the Morton County Court appointed William Chaussee, public administrator for Burleigh and Morton Counties, as Toby's conservator, with limited powers designed to leave Toby free to manage his daily affairs and checking account, but to consult with Toby on decisions affecting his property and to prepare a complete inventory of his property, as well as annual accounts.

On September 24, 1991, Toby revoked the power of attorney that he had given Elvira Thiel on August 2, 1989. On November 4, 1991, the Veteran's Administration notified Toby that it was terminating Toby's benefits as of September 1, 1989, because "you have received an inheritance in 1989 with a total value of approximately $126,000 and that you have been receiving $10,000 per year in farm rentals since 1989." In a follow-up notice of overpayment on November 6, 1991, the VA demanded that Toby repay $7,616 in benefits overpaid him.

Ronald Otto, his veterans service officer, testified that he "g[o]t Toby's money back" by convincing the VA "that Toby was paying [expenses] out of his own checkbook for Ole's last illness and burial" and "that any income that he would have received from that land before the estate was closed was estate money." Otto testified that "I was able to help [Toby] reinstate his benefits," at least temporarily, but that Toby "would ... be better off" with the farmland rental income of $8,800 per year, than with the VA pension.

As conservator for Toby, Chaussee sued Elvira Thiel and Schirado on December 2, 1991, to set aside the deeds transferring the farmland and the Almont home, to pay over the lease and contract monies from the farmland to Toby, and to obtain other equitable relief on theories of fraud, undue influence, mutual mistake of law and fact, lack of consideration, and breach of fiduciary relationship. After trial, the trial court set aside the deed to the Almont residence, dated September 18, 1989, for mistake, but held that the evidence "clearly and convincingly establishes that Toby Ramsland knowingly and voluntarily sought to gift the [800 acres of farmland] of the Ole Ramsland estate to [Elvira] Thiel."

Nevertheless, in the same paragraph, the trial court concluded that Toby's "motivation to make said gift[ ] was to preserve his status as a recipient of his veteran's benefit pension" under the belief that "Thiel would provide for Toby Ramsland for the rest of his life, much as his brother had previously." Moreover, the trial court declared that "the attempted renunciation by Toby Ramsland [of his inheritance from Ole's estate] is ineffective and is therefore, set aside in its entirety," apparently because it was made more than nine months after Ole's death. *See* NDCC 30.1-10-01. Unaccountably, the trial court confirmed the June 6, 1990 conveyance as completely "valid," making Elvira Thiel "the owner in fee simple" of the farmland without the condition that the trial court found Toby intended, "to provide for Toby Ramsland for the rest of his life."

Also, inconsistently, the court ordered Thiel to reimburse Toby "for any and all real estate taxes paid upon said real estate subsequent to June 6, 1990," but ordered all rent and contract payments, held on deposit with the clerk, disbursed to Thiel, rather than used for the expressed purpose of the transfer to Thiel to benefit Toby "for the rest of his life."

While the conservator appeals an array of questions, urging Toby's incompetence, his mistakes of fact and law, and undue influence and constructive fraud on him by Elvira Thiel and Schirado, I agree the trial court's decisions on those matters are largely affirmable. Among the reasons the majority opin-

ion employs to affirm, though, is that "Toby's actions ... were consistent with his past practice of retaining his pension by conveying away any interest he received in the farmland." But Toby's past reliance on his brothers to care for him, while he kept his pension, is not the same as his dependence on a more remote relative, who has neither maintained his trust nor assured the continuation of his pension.

Moreover, the conservator seeks appropriate equitable relief for Toby based on Elvira's fiduciary relationship to Toby, one of his theories in the trial court. In my opinion, rather than confirm Elvira Thiel's unconditional ownership of the Ramsland farm, the trial court was obliged by law to grant Toby limited equitable relief in the form of a resulting trust on all income from the farmland during his lifetime.

Limited equitable relief most closely fits the findings that the trial court made about the reason for, and purpose of, the farmland transfer that Toby gave Elvira Thiel. *See* NDCC 59–01–05 and 59–01–06(2) ("One who gains a thing by ... mistake, ... the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it."). Considering the ineffectiveness of the renunciation that Schirado had Toby make, and the express directions of 38 U.S.C. § 1522 about the use of "the corpus of the estate of the veteran," quoted in the majority opinion, Toby's pension status is still uncertain. While the renunciation may not have been necessary to make the gift of land, it was probably important to preserve his pension.

Unable to depend on Elvira Thiel to "provide for [him] for the rest of his life, much as his brother had previously," Toby should receive enough equitable relief to get the income from the Ramsland farm during his lifetime. With this limited relief, Elvira Thiel will have the land when Toby is gone, as he intended, but she will be made to keep her admitted promise to Toby about the gifts: "I will give you enough money."

The principles for this relief are generally explained by the Restatement (Second) of Trusts in an Introductory Note to General Principles of Resulting Trusts, Ch. 12, Topic 1, pp. 322–26 (1959). Because the trial court did not recognize its power to grant equitable relief in the form of a resulting trust for Toby on the income from the farmland for his lifetime, I vote to remand with directions to allow that limited equitable relief unless some valid defense exists that was not presented here.