1997 ND 138

**Rhonda M. REIMCHE, Plaintiff and Appellant,**

v.

**Keith R. REIMCHE, Defendant and Appellee.**

**Civil No. 960239.**

Supreme Court of North Dakota.

July 17, 1997.

Kelly Ann Dillon, Minot, for plaintiff and appellant.

Debra R. Edwardson, of Edwardson Law Office, Minot, for defendant and appellee.

NEUMANN, Justice.

[¶ 1] Rhonda M. Reimche appealed from a divorce judgment awarding Keith R. Reimche custody of their son, Tyler, and from an order denying her motion for a new trial. We affirm.

[¶ 2] Keith and Rhonda were married in 1989. Tyler was born in 1990. Rhonda sued for divorce in 1994. Both parties sought custody of Tyler at trial on July 17, 1996. The trial court awarded custody of Tyler to Keith, and liberal visitation to Rhonda. The trial court denied Rhonda's motion for a new trial and Rhonda appealed the judgment and the order denying her motion for a new trial.

## I.

[¶ 3] Rhonda contends the trial court erred in denying her motion for a new trial on grounds of irregularity and surprise. Rhonda asserts Keith failed to supplement his December 1, 1994, interrogatory answer that he did "not want custody, just reasonable visitation." She argues she was denied a fair trial because she was without sufficient notice of Keith's intent to seek custody of Tyler.

[¶ 4] Rule 26(e)(2)(B), N.D.R.Civ.P., requires a party "seasonably to amend a previous response if the party ... knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." The purpose of the rule is to eliminate surprise at trial. *Dewitz by Nuestel v. Emery*, 508 N.W.2d 334, 339 (N.D.1993). To be seasonable, a supplemental response must be made a reasonable time before trial. *Id.* A determination of reasonableness is within the sound discretion of the trial judge. *Id.*

[¶ 5] On May 16, 1996, Rhonda's attorney filed a certificate of non-readiness. On May 28, 1996, Keith's attorney filed a responsive motion and brief, stating, in part, that "the only issue of contention between the parties is custody and visitation concerning the parties' minor son, Tyler Justin Reimche." In a letter of July 11, 1996, Keith's attorney informed Rhonda's attorney:

"As to visitation and custody, my client proposes the following:

"1. That Rhonda have custody on the condition that the minor child reside with Rhonda at Rhonda's place of residence and that Rhonda resume primary caretaking duties. Also, that the minor child shall be clearly informed of his familial relationships. If these conditions are not met, Keith will seek custody at the trial scheduled for July 17, 1996."

In a letter of July 15, 1996, two days prior to trial, Keith's attorney formally supplemented Keith's interrogatory answers by stating, "Yes, Keith is planning to seek custody based on the best interests of the child."

[¶ 6] In a discussion following closing arguments at trial, Rhonda's attorney said she received Keith's July 11, 1996, proposal on the Friday or Monday before trial. The trial court asked the parties' attorneys: "I am wondering procedurally if either party would feel disadvantaged because of the way they tried their case if I would interpret the pleadings as they are on their face and make a custody determination instead of assuming that custody had been waived by the Defendant." Rhonda's attorney replied that she would ask for the appointment of a guardian ad litem to "look into the allegations ... that Rhonda is not in fact raising her child" and "[t]o look into the relationship Tyler has with his father." The trial court asked of Rhonda's attorney: "[B]ecause of Friday's or Monday's communication, did you do anything to react to that? Would you do anything differently?" Rhonda's attorney re-

sponded: "Quite honestly, at that late notice, I didn't know if I could even line up someone to interview the parties and interview the child, look at the child's home, and be able to be here today."

[¶ 7] The trial court ruled "that as of at least the first part of this week, all parties were clear that custody was an issue." The court also determined that appointment of a guardian ad litem was not necessary:

> "That as to the request to supplement the record by a report from the guardian ad litem, I tend to agree with Ms. Edwardson that the issues enumerated by Counsel Dillon that might be addressed by a guardian ad litem have been presented in court and subjected to cross examination. And as to those specific issues, frankly, the answers to those issues I don't find necessarily determinative anyway. Most of the issues that have been presented or inquired about relate to questions that the Court doesn't have."

[¶ 8] In denying Rhonda's motion for a new trial, the trial court noted that in a pretrial telephone conference with both attorneys on July 15, 1996, the court was informed Keith was pursuing custody, and was advised in chambers immediately before trial that Keith was seeking custody. The court also noted that "[a]t neither conference did the Plaintiff express surprise or indicate she was not ready to proceed with the trial."

[¶ 9] A continuance is the proper remedy for a party claiming unfair surprise. *State v. VanNatta,* 506 N.W.2d 63, 69 (N.D. 1993); *Williston Farm Equip., Inc. v. Steiger Tractor, Inc.,* 504 N.W.2d 545, 552 (N.D. 1993). "A judgment will not ordinarily be reversed on appeal for surprise at the trial, where no request is made for a continuance at the time and there is no showing of inability to meet the situation." *North Dakota Pub. Svc. Comm'n v. Central States Grain, Inc.,* 371 N.W.2d 767, 780 (N.D.1985). As this court explained in *Hamre v. Senger,* 79 N.W.2d 41, 47 (N.D.1956):

> "As a general rule, a party asking for a new trial on the ground of surprise at evidence must have indicated his surprise to the court at the time, and should not have proceeded with the trial and speculat-

ed on the chances of a favorable verdict, but should have asked for delay or a continuance to enable him to overcome the effect of such evidence."

"A new trial will ordinarily not be granted for surprise or accident unless ... a new trial will probably result in a changed verdict." *Id.* "A trial court's denial of a motion for a new trial, or for relief from the judgment under Rules 59 and 60 is purely discretionary, and we will not disturb its decision on appeal unless there is an affirmative showing of a manifest abuse of discretion." *Frafjord v. Ell,* 1997 N.D. 16, ¶ 5, 558 N.W.2d 848.

[¶ 10] Rhonda knew before trial that Keith was seeking custody of Tyler. She did not object or request a continuance. Rhonda did not show an "inability to meet the situation," *Central States Grain, Inc.,* 371 N.W.2d at 780, or that "a new trial will probably result in a changed verdict." *Hamre,* 79 N.W.2d at 47. We conclude the trial court did not abuse its discretion in denying Rhonda's motion for a new trial on the ground of irregularity or surprise.

## II.

[¶ 11] Rhonda contends the trial court's custody award is not supported by the weight of the evidence. We exercise a limited review, as "the trial court's findings 'come here well armed with the buckler and shield of ... [Rule] 52(a).'" *Hirschkorn v. Severson,* 319 N.W.2d 475, 479 (N.D.1982) (quoting *Horton v. U.S. Steel Corp.,* 286 F.2d 710, 713 (5th Cir.1961)). Under Rule 52(a), N.D.R.Civ.P., a finding of fact will not be set aside unless it is clearly erroneous.

[¶ 12] "In a divorce proceeding, the trial court must award custody of the minor children based upon a determination of the best interests and welfare of the children." *Schestler v. Schestler,* 486 N.W.2d 509, 512 (N.D.1992). "The trial court is vested with substantial discretion in matters of custody and in the determination of what is in the best interests of the children." *Id.* A trial court's custody determination is a finding of fact that will not be set aside on appeal unless it is clearly erroneous. *Id.* "A trial

court's findings of fact are presumptively correct." *Fenske v. Fenske*, 542 N.W.2d 98, 102 (N.D.1996). "The complaining party bears the burden of demonstrating on appeal that a finding of fact is clearly erroneous." *Buzick v. Buzick*, 542 N.W.2d 756, 758 (N.D.1996), In reviewing findings of fact, we must view the evidence in the light most favorable to the findings. *Chaussee v. Thiel*, 520 N.W.2d 789, 791 (N.D.1994). "A choice between two permissible views of the evidence is not clearly erroneous." *Id.* "Simply because we might view the evidence differently does not entitle us to reverse the trial court." *Schestler*, 486 N.W.2d at 512. A finding of fact is clearly erroneous only if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

[¶ 13] Our limited review of findings of fact recognizes that the trial court is in a better position to evaluate evidence than we are:

"This limited scope of review recognizes that the trial court, having had the opportunity to observe and assess the demeanor and credibility of the witnesses, is in a much better position to ascertain the true facts than an appellate court, which must rely on a cold record. We will not reexamine findings of fact made by the trial court upon conflicting evidence, and a choice between two permissible views of the weight of the evidence is not clearly erroneous. When reasonable evidence in the record supports the findings, we will not retry the case to substitute findings we might have made for those of the trial court." (Citations omitted.)

*Buzick*, 542 N.W.2d at 758. *See also Fenske*, 542 N.W.2d at 102.

■ [¶ 14] The trial court found that Tyler, "since the separation of the parties, primarily has been in the care, custody and control of his maternal grandparents." The trial court considered the factors listed in NDCC 14–09–06.2(1) for determining the best interests and welfare of the child. After stating its findings on the factors listed in NDCC 14–09–06.2(1), the trial court made its custody determination:

"12. That the Court finds the determination of child custody in this case is a close call. Based on the Court's overview of the facts, the Court's view of the demeanors of the parties, the Court's impression as to which party would pay the most attention to the child, the Court's understanding from reviewing the file and the evidence that perhaps some of [Keith's] inattention was caused by either legal or intentional frustration of visitation by [Rhonda], it is the Court's finding that the best interests of the child is served by placement of the care, custody and control of the child with the father."

In announcing its findings after trial, the court said Rhonda's credibility "in the eyes of the Court is very questionable." In denying Rhonda's motion for a new trial, the trial court said Rhonda's "apparent indifference to the child was a significant factor in the decision as well as demeanor of the parties."

[¶ 15] Rhonda admitted lying on a number of occasions and, as the trial court observed, Rhonda's "primary answer to any question was—whether it was relevant, not relevant, important or not important—was: I don't recall." There was evidence: (1) Tyler was living with Rhonda's parents in Ray, while Rhonda lived in Stanley and visited Tyler in her parents' home on days off from work;[1] (2) Rhonda believes Tyler should make custody and visitation determinations; (3) Rhonda has never allowed Keith to take Tyler for overnight visitation;[2] (4) Tyler was "excited to see" Keith when he visited; (5) If Keith were granted custody of Tyler, Tyler would be living with him, Keith would enroll Tyler

---

1. Rhonda explained she had earlier been living in her grandmother's house, but "[t]he plumbing and the furnace went out two years ago," and she does not commute daily to her work in Stanley because her parents' pickup, which she had been driving, "broke down six months ago, roughly." Rhonda testified she is planning to repair the pickup and is planning to get a home of her own.

2. "Visitation between a child and her noncustodial parent is presumed to be in the best interests of the child" and is "a right of the child." *Blotske v. Leidholm*, 487 N.W.2d 607, 610 (N.D. 1992).

in Sunday school, and Keith would not expect his family to be Tyler's primary caregivers; and (6) If Keith were granted custody, "[t]here would be no problem" with visitation for Rhonda.

[¶ 16] The record evidence supports the trial court's findings. Our review of the entire evidence has not left us with a definite and firm conviction that a mistake has been made. Rhonda has not met her burden of demonstrating that any of the trial court's findings are clearly erroneous. Viewing the evidence in the light most favorable to the trial court's findings, we conclude the trial court's custody determination is not clearly erroneous.

[¶ 17] The judgment and the order denying the motion for a new trial are affirmed.

[¶ 18] VANDE WALLE, C.J., and NEUMANN, MARING and SANDSTROM, JJ., concur.

SANDSTROM, Justice, concurring.

[¶ 19] The dissent's criticizing and impugning the father and the trial judge is, I believe, unfair and unwarranted.

[¶ 20] Although the dissent seeks to "invoke Justice Levine" as support, only by redetermining the credibility of witnesses and reweighing the evidence—things Justice Levine constantly reminded this Court it cannot do—can the dissent reach its result.

[¶ 21] Dale V. Sandstrom

MESCHKE, Justice, dissenting.

[¶ 22] I respectfully dissent. There is much more to this case than the majority opinion imparts.

[¶ 23] Rhonda and Keith married November 3, 1989, at Wahpeton, North Dakota, where both had attended college. They soon moved to the farm home of Keith's parents near Harvey, North Dakota, where their son, Tyler, was born June 1, 1990. Shortly after Tyler's birth, they moved to a farm home near Ray, North Dakota.

[¶ 24] There, while Keith attended college in Williston, North Dakota for two years and Rhonda worked, her parents helped care for Tyler. Even when he was home, Keith rare-ly cared for Tyler because Keith had "too much school work."

[¶ 25] In September 1992, Keith moved to Bismarck to attend the University of Mary on school loans. Rhonda and Tyler stayed at Ray where she continued to work. Briefly, in the summer of 1993, they reconciled and lived together, but Keith soon returned to college in Bismarck, while Rhonda and Tyler remained at Ray. Even after Keith graduated from the University of Mary in May 1994, they lived apart, and Keith became employed part-time as a respiratory therapist at a medical center in Harvey.

[¶ 26] In July 1994, Rhonda and Tyler moved to her parent's double-wide mobile home in Ray, and she sought a divorce. Keith counterclaimed for custody of Tyler or for reasonable visitation. On December 1, 1994, however, Keith answered Rhonda's discovery interrogatory: "Are you planning to seek custody of your minor child?", by responding: "We do not want custody, just reasonable visitation."

[¶ 27] In mid–1995, Keith became employed full-time as a respiratory therapist at a Minot medical clinic with a salary over $22,000 a year, and began rooming at his sister's family home in Minot. After becoming employed, Keith paid nothing for Tyler's "room, board, clothing, [or] medical" even during the year before trial when he was employed full-time.

[¶ 28] While living with her parents, Rhonda worked at three part-time jobs around Ray earning about $7,500 during 1994. In 1996, she became employed as a life-skills teacher to developmentally disabled patients at a Tri–City Care home in Stanley, North Dakota and made a daily commute of 36 miles. Her hours were in scattered split-shifts over six days a week: from eleven-thirty A.M. to three P.M., Monday through Friday; four-thirty to ten-thirty P.M. on Monday and Tuesday; six to nine P.M. on Friday; and noon to ten P.M. on Saturdays. When her pickup broke down in late winter 1996, her daily commutes often became weekly commutes. Although both of Rhonda's parents also worked, their separate jobs usually made it possible for them to babysit

Tyler while Rhonda worked. Rhonda's sister helped sometimes when her mother's school-bus-driving job took both of her parents out of the home at the same time.

[¶ 29] Rhonda's earnings were insufficient for her to get health insurance for herself and Tyler at a cost of $250 monthly, although Rhonda believed Tyler had allergies that she could not afford to have tested, and although Tyler needed a retainer to straighten his teeth. Even after Keith graduated and became employed full-time with an income of $24,000 in 1995, Keith sent Rhonda nothing to help support Tyler. In March 1996, when Keith was asked to send $1,000 to pay for Tyler's dental braces, he stalled ("let's wait and see what comes up") and did nothing to help.

[¶ 30] Disposition of the divorce was delayed by various things, including each parents' inability to pay their attorneys and each changing attorneys, but all disputes about property and debt allocation were settled before trial. Less than a week before trial, by a letter mailed Thursday, July 11, Keith made an offer to let "Rhonda have custody" upon vague conditions for her custody and his visitation, and blusteringly threatened: "If these conditions are not met, Keith will seek custody at the trial scheduled for July 17, 1996."

[¶ 31] In a telephonic pre-trial conference on Monday, July 15, 1996, two days before trial, Keith's counsel again indicated Keith would seek custody if his custody and visitation conditions were not met. The next day, July 16, Keith's Minot counsel posted a July 15 letter to Rhonda's Minot counsel clearly stating for the first time that Keith intended to seek custody of Tyler at the trial imminent on July 17. The letter said:

> Pursuant to our recent telephone conference, I hereby informally submit supplemental information pursuant to Rule 26(e)(2).
>
> . . .
>
> 97. Custody of child: Yes, Keith is planning to seek custody based on the best interests of the child. . . .

Unfortunately, when the Minot office of Rhonda's counsel received the July 15 letter

on July 17th, Rhonda's counsel was at the trial and did not actually get to read the letter until July 18, after her return from the Williston trial.

[¶ 32] After the trial on July 17, although there is virtually nothing in the record to support it, the trial court found:

> Prior to the trial date, [Keith] informed [Rhonda] that he would be seeking custody of the parties' minor child at trial.

Apparently the court based this conclusory finding on the activities of Keith's counsel during the last few days before trial, which the court described:

> The attorneys for the parties made the positions of their respective clients known to the Court during a telephone conference call on Monday, July 15, 1996, and again in chambers just prior to trial on Wednesday, July 17, 1996. [Rhonda] knew that [Keith] was requesting the Court to make a custody determination based on the best interests of the minor child. [Rhonda] made no objection nor did [she] request a continuance of the trial date.
>
> [Keith] tried this action as a custody case. It appeared to the Court that [Rhonda] tried this action as a visitation case. Both parties were given a fair opportunity to try their respective cases as they wished.

There was no "fair opportunity" for Rhonda.

[¶ 33] At the end of the trial, plainly uncomfortable with the posture of the case, the trial court discussed the procedural difficulty with deciding custody when Keith's unsupplemented discovery answers had confined the contested issue to visitation:

> During a pretrial conference just this morning, I inquired of each of the attorneys as to what the issues were. And counsel for [Rhonda] indicated from her point of view the issue was visitation and how it should be phased in or whatever.
>
> The attorney for [Keith] indicated from her point of view there was a counterclaim in which they were asking alternatives. Either their client, [Keith], have custody, or in the alternative, that some visitation commence immediately[,] is the way I understood what the issues were about.

Paging through the file subsequently, I did note this reference to whether—in the discovery as to whether the issue was custody or visitation. I am wondering procedurally if either party would feel disadvantaged because of the way they tried their case if I would interpret the pleadings as they are on their face and make a custody determination instead of assuming that custody has been waived by [Keith].

Counsel for Rhonda felt disadvantaged and immediately sought time to develop further evidence on custody if it was to be tried:

If that is the way we proceed, procedurally, I would ask that a guardian ad litem be appointed and that the decision of the Court be deferred until the guardian ad litem has had a chance to report to the Court.

Rhonda's counsel outlined what she would expect to develop:

To look at both parties and, you know, especially to look at—to Rhonda's—to look into the allegations that the defense has brought up that Rhonda is not in fact raising her child. Where it is her contention that she is raising her child. That her mother acts as the baby-sitter, essentially.

To look into the relationship Tyler has with his father. To look into how that relationship has grown or has not grown. And to evaluate the impact of Tyler being forced into a situation where he has to spend a weekend without the comfort of his mother or his—or the home that he has grown up in.

When the trial court asked Rhonda's counsel what she had done to react to "Monday's communication," two days before, "that this may be a custody issue," she replied (reasonably, in my opinion):

Quite honestly, at that late notice, I didn't know if I could even line up someone to interview the parties and interview the child, look at the child's home, and be able to be here today.

The trial court concluded, "as to the request to supplement the record by a report from [a] guardian ad litem, I tend to agree with [counsel for Keith] that the issues enumerated by Counsel [for Rhonda] that might be addressed by a guardian ad litem have been presented in court and subjected to cross examination."

[¶ 34] Incredibly, the trial court downplayed the importance of the factual questions Rhonda's counsel raised about custody:

And as to those specific issues, frankly, the answers to those issues I don't find necessarily determinative anyway. Most of the issues that have been presented or inquired about relate to questions that the Court doesn't have.

Even more, the court refused time for Rhonda's counsel to develop further evidence on custody despite "the potential that the kinds of information that may be of assistance to the Court would be based upon home studies, psychological examinations, those kinds of professional reports."

[¶ 35] In my opinion, the trial court clearly abused its discretion by rushing to judgment on custody without giving Rhonda an opportunity, as the parent disadvantaged by Keith's misleading and unsupplemented discovery answer, to develop her evidence on custody. In view of Keith's flagrant failure seasonably to supplement his misleading answers to interrogatories, Rhonda was entitled to some relief: "A party is under a duty seasonably to amend a previous [discovery] response if . . . (B) the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." NDRCivP 26(e)(2)(part). *See Dewitz by Nuestel v. Emery*, 508 N.W.2d 334, 339 (N.D. 1993)(to be seasonable, a supplemental response must be made in reasonable time before trial taking into account the purpose of the rule to eliminate surprise at trial).

[¶ 36] For failure to supplement interrogatory answers seasonably, a trial court has wide discretion under NDRCivP 37(d) to order any relief for the disadvantaged party that is designated in subsection(b)(2)(A), (B), and (C) or, "[i]n lieu of any order or in addition thereto, the court *shall* require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the

failure was substantially justified or that other circumstances make an award of expenses unjust." (emphasis added). The trial court made no finding that Keith's failure was substantially justified, and exercised no discretion to grant relief to Rhonda for Keith's failure to seasonably supplement his misleading answer.

[¶ 37] At the very minimum, relief for Rhonda should have included more time for her, the disadvantaged party, to marshall supplemental evidence on custody. In my opinion, the trial court abused its discretion in not allowing the time requested by Rhonda's counsel to seek and supply the evidence she felt needed for the suddenly changed character of the trial.

[¶ 38] While visitation is always a feature of custody, changing custody is certainly not a recognized feature of a visitation dispute. Custody of a child is much too important a subject for summary judicial action without adequate opportunity to prepare and present evidence. I find it impossible to justify this trial court's arbitrary change of custody away from the child's primary caretaker of six years, and to place it with a virtual stranger of a father, who only visited Tyler eighteen times in three years, each visit being only for a few hours at a time.

[¶ 39] From the sole care of his mother, assisted by her parents who babysat Tyler while she worked, during the four continuous years before trial, the trial court found Tyler to be "a very impressive child," who was "bright, confident, outgoing, and unafraid." Strangely, the court credited Tyler's absent father, Keith, equally with Tyler's primary-caretaker: "Both [parents] may be able to take some credit because both had some early input." Paradoxically, the court found Keith "failed to provide financially for his child," and found "this strange attitude of not doing something financially to support a child that he professes to care for, in blunt language, to be very crummy." The trial court recognized "to some extent that [Keith] has exhibited a financial abandonment of the child." Keith's physical and financial abandonment of Tyler should have precluded placing custody with Keith, unless the trial court clearly found Rhonda unfit.

[¶ 40] The trial court did not, and could not under the evidence, conclude Rhonda was an unfit mother. She had raised "a very impressive child" without any help from Keith.

[¶ 41] The trial court found no lack of parental fitness with Rhonda as a mother, but seems to have made its custodial decision on three relatively unrelated factors: (1) Rhonda did not encourage or permit away-from-home-visitation with Tyler's stranger-father; (2) Rhonda let her parents help too much in raising Tyler; and (3) some perceived evasiveness in Rhonda's testimony about her life with Keith. In my opinion, those reasons are wholly insufficient to take custody from a six-year-old boy's sole caretaker to place him with a parent he barely knew.

[¶ 42] On credibility, the trial court remarked that Rhonda's "primary answer to any question, whether relevant or not relevant, important or not important, was, 'I don't recall.' " The court then "assume[d] this is an indication of either disdain for the trier of fact or an intention not to truthfully lay out the whole past so that the Court could make an informed decision" on custody. It seems not to have entered the court's head that Rhonda's hesitant answers might have been due to lack of adequate preparation with her attorney on the custody question that they had only barely learned would be a subject at the trial. The court never explained what it was in "the whole past" of these parents that it lacked information about for a custody decision, and the court didn't give Rhonda a chance to try a custody case.

[¶ 43] The trial court recognized Rhonda's "parents perhaps can take some credit" for Tyler's "bright, confident, outgoing, and unafraid" character "because it appears that they have had the primary responsibility in the last year and a half, at least." The court felt "the child has not effectively resided with either parent for the last year and a half," although the court grudgingly recognized that it "is obvious that the mother has had significantly more recent contact with the minor child and the Court heard no indication that there was not love and affection and

emotional ties" between her and Tyler. The trial court found Tyler's "predominant home was the grandparent's home without significant input from the mother." How the trial court reached this sweeping conclusion should be a matter of a great deal of attention in our review. There is little, if any, evidence for it.

[¶ 44] If it was attributable to Rhonda's hesitant testimony, the trial court seems to fault her for holding a low-paying, split-shift job 36 miles from home that kept her away from Tyler most of the week, at least from mid-forenoon to late-night except on Sundays, while she lived with, and relied on, her parents to help care for Tyler. A lone mother, unskilled, uneducated, and without either financial or physical help from an absent father, can hardly be expected to give full-time care to a child at home in today's world. We should be very concerned whether the trial court is demonstrating an undesirable bias without satisfactory evidence about the extent of Rhonda's continuous absence from her parent's home. Except for innuendos from the absent father and his even more distant mother, no one questioned who gave daily care to Tyler.

[¶ 45] Sometime ago, this court recognized that the " 'primary caretaker' ... concept inheres in the statutory factors" for custodial placement, *Gravning v. Gravning*, 389 N.W.2d 621, 622 (N.D.1986), but we have yet to fully adopt the primary-caretaker presumption. This case, however, surely demonstrates why we ought to.

[¶ 46] Justice Levine explained why we should do so in her separate opinion in *Gravning*:

> I believe we should adopt the rule that when equally fit parents seek custody of children too young to express a preference, and one parent has been the primary caretaker of the children, custody should be awarded to the primary caretaker.

389 N.W.2d at 624–25 (footnote omitted). Justice Levine told us how to identify the primary caretaker:

> The primary caretaker is the parent who provides the child with daily nurturance, care and support. For example, the following have been held to be indicia of primary caretaker status: (1) preparing and planning meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning and care of clothing; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers; (6) arranging alternative care, i.e., babysitting, day-care; (7) putting child to bed at night, waking child in the morning; (8) disciplining child, i.e., teaching general manners and toilet training; (9) educating, i.e., religious, cultural, social, etc.; (10) teaching elementary skills, i.e., reading, writing and arithmetic....

*Id.* at 624 n. 1 (citations omitted). There is no evidence that Keith did any of this for Tyler, at least for more than four years. It is clear Rhonda did so nearly continuously, even though she didn't get a reasonable opportunity to offer all the proof she wanted to supply on this aspect.

[¶ 47] Eventually, I came to fully agree with Justice Levine that the primary caretaker concept had overriding importance, but we never reached a consensus to satisfactorily implement the presumption while she was on the court, although Justice Levine continued to advocate the need for it. *See Branson v. Branson*, 411 N.W.2d 395, 401 (N.D.1987)(Levine, J., concurring and dissenting); *Kaloupek v. Burfening*, 440 N.W.2d 496, 500 (N.D.1989)(Levine, J., dissenting). In *Dinius v. Dinius*, 448 N.W.2d 210, 217–19 (N.D.1989), I joined in Justice Levine's "thoughtful dissent," which urged that the statutory factors, NDCC 14–09–06.2(4) and (5), if "properly construed," "would have[ ] awarded custody to the primary caretaker, who in this case was the mother." In a brief separate opinion, I agreed, *id.* at 219: "When factors 4 and 5 are properly weighed, they go to the overriding importance of the stability, continuity, and permanence embodied in a primary caretaker's relationship with the children."

[¶ 48] At the very least, the trial court in this case failed to consider the importance of "[e]stablished patterns of care and nurture [which] are relevant factors for the trial court to have considered" in deciding custody. *Heggen v. Heggen*, 452 N.W.2d 96, 101

(N.D.1990). The reasons for applying a primary-caretaker factor are vividly portrayed in this case.

[¶ 49] There are at least four main reasons for using the primary-caretaker factor as a presumption, as Justice Levine explained in *Gravning*. First, "it will generally be in the child's best interest to be in the primary caretaker's custody." 389 N.W.2d at 625. Second, "continuity of care with the primary caretaker is the most objective, and perhaps the only predictor of a child's welfare about which there is agreement and which can be competently evaluated by judges." *Id.* Third, "the primary caretaker rule will benefit the negotiation process between divorcing parents." *Id.* That reason is vividly illustrated here, where at the last minute Keith tried to bargain custody of Tyler to get the kind of away-from-home visitation that he was demanding without any transition period of more attention than just an hour or two every two months.

[¶ 50] Finally, "on its face, at least, the primary caretaker rule is gender neutral; it may benefit either parent." *Id.* That would be important here, where the court awarded custody to a distant father who had been physically absent for four years, had done little or nothing to care for Tyler at any time, and abandoned Tyler financially for over four years, including two years of gainful employment. Even more, Keith had done nothing about one of the main premises of the primary caretaker concept—"arranging alternative care, i.e., babysitting, day-care"—but the trial court accepted Keith's snide criticism of Rhonda's exceptional performance of this important function in primary-caretaking. *See Bashus v. Bashus*, 393 N.W.2d 748, 751 (N.D.1986)(affirming custody placement with father, the primary caretaker, where his " 'extended family' was a factor weighing in his favor" because father's "mother cared for the children while [he] was at work" and "remains available to assist in the care of the children"). Rhonda should be complimented, not condemned, for enlisting her extended family's assistance in raising Tyler to be "a very impressive child."

[¶ 51] Instead, the trial court removed custody from a primary care-taker (and her extended family) who had grubbed away at low paying, part-time jobs to support herself and her son, while seeking to save enough money to repair her broken down pickup and to find an affordable home close to her helpful parents. And, instead, the court placed custody with a parent who had physically and financially abandoned the caretaking parent and the child. In weighing these two parents, the trial court astonishingly felt the custody decision in this case was a "close call"!

[¶ 52] The trial court rationalized that "perhaps some of [Keith's] inattention [to Tyler] was caused by either legal or intentional frustration of visitation by" Rhonda. However, a change of custody should be the last resort to remedy visitation problems. *See Van Dyke v. Van Dyke*, 538 N.W.2d 197, 201 (N.D.1995)("we agree, that prior to resorting to a change in custody other methods should be tried to remedy a parent's misbehavior" in frustrating visitation); *Alvarez v. Carlson*, 524 N.W.2d 584, 591 (N.D.1994)("changing custody to remedy visitation problems is a last resort"). Keith neglected to tell us why an interim order for an appropriate visitation schedule had not been obtained during the two years this case was pending. Keith's appellate brief lamely said, "[d]ue to procedural errors, an interim order was not obtained."

[¶ 53] As I read this record, neither Rhonda nor her parents denied Keith's access to Tyler when he came to their home to see him. Instead, Keith complained mainly that Rhonda wouldn't let him take Tyler away to his home for weekends or for extended visits. Keith rationalized his lack of frequent visits by saying, "it gets very hard to drive up, spend three hours on the road, when I am stuck in their house with them watching me all the time" to visit Tyler every six weeks or two months.

[¶ 54] Also, considering Keith's inattention to Tyler, both financially and physically, it is not surprising to me that Tyler's mother believed it was desirable for Keith to "come more frequently, yes, and get to know Tyler." Nor is it surprising Rhonda believed it might take eight months of frequent, supervised visits in her home before Tyler would

be ready to go for extended visits with his father, a virtual stranger. *See In Interest of E.J.H.*, 546 N.W.2d 361, 363 (N.D.1996)(affirming trial court's change of custody to a "distant" father, but delaying it for a number of months to "provide[ ] a transitional period of increased visitation before the transfer of custody."). In *E.J.H.*, 546 N.W.2d at 364–65, we said:

> Some witnesses did express the need for a period of transition before Q.P. obtained custody of T.S.H. and, following the separation, the need for extensive visitation. The trial court addressed these concerns by ordering T.S.H. to remain in the custody of Social Services until August 15, 1995, allowing time for T.S.H. and Q.P. to cultivate their relationship.

[¶ 55] It is surprising to me that, without a transition, the trial court placed custody of Tyler with a virtually unknown father, who was rooming in his sister's home where Tyler would be in "an extra bedroom or an extra room for him in my nephew's room [in Keith's sister's home]," and where "[h]e could sleep with him for a little while" until Keith decided how to arrange a home of his own. Also surprisingly, the trial court ignored Keith is a "smoker" who acknowledged "Tyler reacts adversely to cigarette smoke."

[¶ 56] I am firmly convinced that it was an abuse of discretion for the trial court to decide custody without giving Rhonda a seasonable opportunity to present custody evidence, and that the court was badly mistaken in removing custody from a fit primary-caretaker to place a six-year-old with a father who had virtually abandoned the child for four years. Therefore, I respectfully dissent.

[¶ 57] Herbert L. Meschke