**Randy SEVERSON, Plaintiff and Appellee,**

v.

**Carla HANSEN, Defendant and Appellant.**

Civ. No. 940163.

Supreme Court of North Dakota.

Feb. 28, 1995.

Robert S. Thomas (argued), Thomas Law Firm, Minot, for plaintiff and appellee.

Richard L. Hager (argued), Kenner Sturdevant, P.C., Minot, for defendant and appellant.

MESCHKE, Justice.

Carla Hansen appeals from a decree placing custody of the child, Maci Marie Severson, with her father, Randy Severson. We affirm.

Severson and Hansen have never been married, but they lived together for more than a year and have one child, Maci, born on

September 10, 1991. After their relationship ended, Severson sued Hansen for custody of Maci. With the approval of both parents, the trial court appointed a psychologist, Dr. Dion Darveaux, to do a custody investigation, evaluation, and report. After conducting psychological tests, interviews, and observations of both parents, and visiting their homes, Dr. Darveaux recommended that Severson receive primary custody of Maci and that Hansen receive liberal visitation.

After this adverse report, Hansen retained another psychologist, Dr. Stephan Podrygula, to review Dr. Darveaux's custody report. Dr. Podrygula essentially disagreed with Dr. Darveaux's report. After hearing extensive testimony, the trial court adopted Dr. Darveaux's recommendation and placed primary custody of Maci with Severson, and decreed liberal visitation for Hansen.[1] Hansen appealed.

Hansen asserts that, in placing custody with Severson, the trial court abdicated its responsibility to determine Maci's best interests and clearly erred in giving weight and credibility to Dr. Darveaux's "flawed" recommendation.

A trial court's determination of child custody is a finding of fact and will not be set aside on appeal under NDRCivP 52(a) unless it is clearly erroneous. *Weber v. Weber*, 512 N.W.2d 723 (N.D.1994). As we explained in *Swanston v. Swanston*, 502 N.W.2d 506 (N.D.1993), a finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made.

In an initial child-custody determination, a trial court must decide custody on the best interests and welfare of the child. *Wolf v. Wolf*, 474 N.W.2d 257 (N.D.1991). In determining the best interests of the child, the trial court has substantial discretion, but

1. After trial was completed on December 16, 1993, the trial court took the custody dispute under advisement and rendered its opinion on April 22, 1994. We recognize that both parents contributed to some pre-trial delay, and we agree with the trial court that, because of the acrimony between the parents, this custody dispute was "difficult." Both the child and the parents benefit, and the legal system functions best, when custody disputes are promptly resolved.

it must consider and evaluate the factors listed in NDCC 14–09–06.2. *Id.* Although the trial court is not required to make a separate finding on each statutory factor, the court's findings should be stated with sufficient specificity so that we can understand the factual basis for its decision. *Id.*

■ This ·record demonstrates that both parents have a loving relationship with Maci and that both are capable of meeting her needs. Dr. Darveaux's report recognized that Severson's employment status would allow him to spend an almost unlimited amount of time with Maci while Hansen's employment would not. Dr. Darveaux's report said that Maci needs a combination of resources from both parents and that her best interests would be served by being with at least one of her parents as much as possible. Dr. Darveaux thus concluded that it would be in Maci's best interests for the non-custodial parent to have generous visitation privileges. Relying on his evaluation of the parents' psychological makeup, Dr. Darveaux concluded that Severson would be the more amenable parent for scheduling generous visitation with the other parent that would best meet Maci's interests. Based on these factors, Dr. Darveaux recommended that Severson have primary custody of Maci with generous visitation for Hansen.

■ In placing Maci in Severson's primary custody, the trial court followed Dr. Darveaux's recommendation. In relying on an expert, such as a psychologist, to determine the best interests of a child, we are sensitive to the requirement that a trial court ·should not abandon its ultimate responsibility to make the decision. *See Berg v. Berg,* 490 N.W.2d 487, 492 (N.D.1992) (VandeWalle, Justice, concurring). However, Hansen's argument that Dr. Darveaux's recommendation was "flawed" because it contained "both glaring bias and unsubstantiated conclusions" goes to the weight given to that evidence by the trial court. *Weber; Berg.* Here, the court found that Dr. Darveaux's recommendation was "further sustained by the Court's observation of the parties as they testified and responded at the hearing." The credibility of witnesses, including experts, and the weight to be given their testimony are factual determinations for the trial court, and under NDRCivP 52(a), we give due regard to the trial court's opportunity to assess the credibility and demeanor of the witnesses.

The trial court found that Severson has considerable time to spend with Maci and also observed that if Severson's employment status changed, the custody arrangement could be modified. "A 'career mother' is not disqualified for custody of her children any more than a working father, but where each parent works outside of the home and where each has the ability and desire to care for their children, the trial court must necessarily weigh the circumstances on a fine and delicate scale." *Landsberger v. Landsberger,* 364 N.W.2d 918, 920 (N.D.1985). Here, the trial court's findings reflect that its custody determination turned on Severson's greater ability to spend time with Maci, as well as his greater flexibility on Maci visiting Hansen. Although the trial court's findings on the relevant factors affecting the best interests and welfare of the child could have been better stated, they are sufficient for us to understand the factual basis for the custody decision.

In situations like this, when two capable parents disagree about how to fulfill their parental responsibilities, courts must choose for them and, often, between them. *Berg; Landsberger.* The trial court did not find that Hansen was a bad parent; rather, the court found that placement of primary custody with Severson was in Maci's best interests. In making that choice, the trial court was vested with wide latitude to determine Maci's best interests, and we will not reverse merely because the evidence might also support other findings, or we might have made different findings if we had tried the case. *Walch v. Jacobson,* 361 N.W.2d 617 (N.D. 1985). We are not left with a definite and firm conviction that the trial court made a mistake in placing custody of Maci with Severson. We therefore hold that the trial court's custody determination is not clearly erroneous.

We affirm the decree.

VANDE WALLE, C.J., and NEUMANN and SANDSTROM, JJ., concur.

LEVINE, Justice, concurring in the result.

Because I agree that it is the trial court's function, not mine, to weigh the evidence, I concur in the result. I write separately to expose the issue of gender bias and to suggest that much needs to be done to educate and familiarize all judges and lawyers (and psychologists too, as this case suggests) on the subject, so that when gender bias is present it can be recognized and diffused.

Dr. Darveaux applied two very different standards in evaluating Randy and Carla's MMPI test results and interviews. For Randy's, the psychologist reasonably took into account the stress and fear inherent in a child custody dispute. So, Randy's "defensive manner" to the test questions "is not uncommon ... on custody evaluations." Indeed, Randy was "appropriately guarded and concerned" during the interview and tests. While his tests showed "considerable degrees of anger and resentment," Dr. Darveaux concluded that completion of the custody dispute would alleviate Randy's "current stress and hostility" and that he would "feel less anxiety and hopefully be less likely to self-medicate his anger and tension with cigarettes and alcohol." Randy was simply "reacting normally to the stress related to his physical separation from Carla, the current custody issues, and the current legal issues Randy [was] having with Carla's father and mother."

On the other hand and in telling contrast, Carla's parallel anger was attributed not to the tension and stress of the custody dispute or the break-up of the marriage or the fear of losing custody, but to "hysteria":

> "Carla's reactivity, in the form of crying, mental inflexibility, and anger, were suggestive of individuals with hysterical reactions.... The most common topics of emotional distress for Carla related to efforts by this psychologist to negotiate a visitation schedule (which gave Randy more time than he has currently), and to questions about how or why she broke up with Randy."

Part of the "hysteria" was the fact that, on two occasions, Carla "teared up and cried," especially "when she felt ... Randy was trying to take advantage of her [whom she accused of stalking her]." Carla "felt that Randy was trying to harrass her in a number of ways" and "maintained a substantial demeanor of resentment toward [him]." "During these angry periods of time, her voice tone became quite sharp, volume would raise (sic), and her thinking style became quite rigid."

Both Carla and Randy had mild elevations on several scales of the MMPI. But Randy's elevations suggest "healthy levels," or "mild personalty trait[s]," not "clinical problem[s]." Carla's elevations provoke the conclusion that she is "emotionally engulfed by the particular circumstances of a situation" and "reacts hysterically in emotional, behavioral, and cognitive ways."

Commenting on Dr. Darveaux's obviously disparate interpretation of Randy and Carla's test scores and interviews, Dr. Podrygula, a psychologist retained by Carla to evaluate the evaluator and his evaluations, testified:

> "And I think that's an issue for women and that's one of the issues ... our profession is facing.... Specifically, women in child custodies will come across as disturbed. Maybe not often, but a significant amount of time and there's concern what that means and how it is interpreted or misinterpreted."

> "[Women] might look paranoid, very angry, very suspicious, and one of the real concerns that many of the people in our field have is how is this information interpreted? ... [One] of the possibilities psychologists in active research and lecturing and thinking are saying is that perhaps this reflects some reality. Perhaps there is some abuse, perhaps there is some stalking, perhaps there is some harassment and that the women [sic] is expressing it in the form of suspiciousness and anger. And you put it hysterical—I prefer not to use that word. So that's a very real issue for us, how do we interpret elevations, particularly for women in these kinds of situations."

See also Carol Tavris, The Mismeasure of Woman (1992) [arguing that countless psychiatric diagnoses contained in the Diagnostic and Statistical Manual of Mental Disor-

*ders* (DSM) derive from societal biases about men and women rather than scientific data]; *A History of Women: Silences of the Middle Ages* 48 (Christiane Klapisch–Zuber ed., 1992) [discussing the origin of the term "hysterical" which derived from the ancient belief that a woman's uterus traveled throughout her body and caused "the choking sensation sometimes experienced by hysterics."]. Modern anatomy and physiology have debunked some ancient views about women, not all. Men and women alike still believe that "typically male" emotions and responses are normal, while "typically" female emotions and responses are not. Tavris, *supra;* Jodie Waisberg, Stuart Page, Gender Role Nonconformity and Perception of Mental Illness, 14 Women & Health 3 (1988); Christiane Brems, Robert S. Schlottmann, Gender–Bound Definitions of Mental Health, 122 J.Psych. 5 (1987). *See also* Lynn Hecht Schafran, Gender Bias in Family Courts, 17 Fam.Advocate 22 (1994) ["there is a predilection on the part of some males to see women as hysterical or particularly vindictive"]; Carolyn A. Goodzeit, Rethinking Emotional Distress Law: Prenatal Malpractice and Feminist Theory, 63 Fordham L.Rev. 175 (1994) [women's complaints of pain are undervalued and dismissed as emotional or hysterical]. Such thinking clouds objective analysis about who will actually make a better custodial parent and what type of parent is in a child's best interests.

> "When men have problems, it's because of their upbringing, personality, or environment; when women have problems, it's because of something in their very psyche. When men have problems, society tends to look outward for explanations; when women have problems, society looks inward." *Tavris, supra* at 175.

In addition to questioning the competence of Dr. Darveaux to act as a clinical psychologist, Dr. Podrygula roundly criticized Dr. Darveaux for assessing credibility to Randy but not to Carla. Dr. Darveaux apparently believed Randy's denial that he harassed Carla. As Dr. Podrygula put it, a psychologist is not an investigator and "there was nothing psychological" that could answer the question of whether Randy did harass Carla by stalking her. Dr. Podrygula also criti-

cized Dr. Darveaux's attempt to mediate visitation without the presence of both parties. He concluded that Dr. Darveaux's labelling of Carla's refusal to accept Dr. Darveaux's visitation schedule as irrational was a "subjective judgment" not justified by the data. But Dr. Podrygula's greatest criticism of Dr. Darveaux was that there was simply inadequate evidence to assert that Carla was "paranoid" and "delusional," very serious, major psychoses, mental disorders.

A custody dispute can be a very stressful time for everyone. The anger and emotion, or repression of them, exhibited by the parties ought to be viewed and evaluated by experts in the context they are expressed. I believe Dr. Darveaux did just that with Randy. I am very skeptical that he gave the same consideration to Carla. But the trial judge weighed the evidence and I defer to his ability to cut through the bias of Dr. Darveaux.

I concur in the result.