1998 ND 26
**Robert H. HOGUE, Plaintiff and Appellant,**

v.

**Kelly M. HOGUE, Defendant and Appellee.**

**Civil No. 970131.**

Supreme Court of North Dakota.

Feb. 12, 1998.

Robert S. Rau of Bosard, McCutcheon & Rau, Minot, for plaintiff and appellant.

[1] We recently held the designation of "joint legal custody" is meaningless, absent a specific defini-

Carol K. Larson of Pringle & Herigstad, Minot, for defendant and appellee.

NEUMANN, Justice.

[¶ 1] Robert Hogue appeals from a divorce judgment challenging the trial court's decision on custody, child support, spousal support, and attorney's fees. We affirm the trial court's custody and attorney fee awards, modify the child support, and reverse and remand the denial of spousal support for further proceedings consistent with this opinion.

[¶ 2] Robert and Kelly Hogue were married in November 1986. Their son, Robbi, was born in December 1990. Kelly was a nurse and an officer in the Air Force throughout most of their marriage. Kelly's career required the Hogues to relocate frequently to accommodate her duty assignments. Robert worked sporadically, sometimes full time, but usually part time, due to the frequent moves, or to attend school. After Robbi's birth, Robert occasionally worked part time, and was a stay-at-home dad. The parties separated in October 1996. Robert filed for divorce, alleging irreconcilable differences.

[¶ 3] The trial court granted the parties a divorce and awarded them joint legal care, custody, and control of Robbi, with Kelly as the primary custodial parent, and Robert receiving liberal and reasonable visitation.[1] The trial court further ordered (1) Robert to pay $250 monthly child support; (2) both parties be denied spousal support; and, (3) Kelly to pay $800 towards Robert's attorney's fees. Robert appeals.

## CUSTODY

[¶ 4] Robert argues the trial court erred in awarding custody of Robbi to Kelly under the best interests of the child factors, partly because he was Robbi's primary caretaker. Robert insinuates he is being discriminated against because of his non-traditional role as a stay-at-home dad. He also argues his relationship with, and his child support obligation

tion. *Dickson v. Dickson*, 1997 ND 167, ¶ 11, 568 N.W.2d 284.

to, a son by a previous marriage have no relevancy in this matter.

[¶ 5] A trial court's determinations of child custody are findings of fact. *Goter v. Goter,* 1997 ND 28, ¶ 8, 559 N.W.2d 834. We review child custody matters under the clearly erroneous standard. *Id.* at 28 ¶ 8; *Reimche v. Reimche,* 1997 ND 138, ¶¶ 11–12, 566 N.W.2d 790. The trial court has substantial discretion in custody matters, and must award custody based on its determination of the best interest and welfare of the child. *Id.* at 138 ¶ 12. " 'A trial court's findings of fact are presumptively correct.' " *Id.* at 138 ¶ 12 (quoting *Fenske v. Fenske,* 542 N.W.2d 98, 102 (N.D.1996)). The trial court is in a better position to evaluate the evidence, and we will view the evidence in the light most favorable to the court's findings. *Id.* at ¶¶ 12–13.

[¶ 6] The best interests and welfare of the child is the paramount consideration in child custody determinations. *Id.* at ¶ 12. Here, the trial court applied the best interests of the child factors under N.D.C.C. § 14–09–06.2 and made specific findings under each factor listed. The trial court found both parties to be fit parents, and viewed them as equal under most factors, or found factors to be inapplicable to these parties, with the exception of factors c and f.

[¶ 7] The trial court found factor c favored Kelly. Section 14–09–06.2(1)(c), N.D.C.C., states: "The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care...." In its findings, the trial court considered Robert's failure to have contact with and pay support for his son by a previous marriage as a negative factor against him.[2]

[¶ 8] Applying factor f, the moral fitness of the parties, the trial court found the moral fitness of the parents was "basically equal," with Robert's lack of support and contact with Blake being offset by Kelly's "fraternization" with enlisted personnel and evidence of her alcohol abuse and treatment.[3]

[¶ 9] We recognize the trial court has a difficult choice to make in deciding custody between two fit parents. *Schmidkunz v. Schmidkunz,* 529 N.W.2d 857, 859 (N.D. 1995); *Weber v. Weber,* 512 N.W.2d 723, 727 (N.D.1994); *Roen v. Roen,* 438 N.W.2d 170, 173 (N.D.1989). We will not retry the case or substitute our judgment for the trial court's, if its determination is supported by evidence in the record. *Schmidkunz,* 529 N.W.2d at 859.

[¶ 10] Robert argues the trial court erred in considering his lack of contact with Blake and his failure to make child support payments for him. Robert argues his relationship with Blake has no relevancy here, and is not applicable under N.D.C.C. § 14–09–06.2. We disagree.

[¶ 11] Robert's expert witness, Dr. James Brandt, the psychologist who administered several psychological tests on Robert testified on cross-examination regarding Robert's failure to pay child support for Blake. When asked if knowing a person had a child from another relationship and had not fulfilled their responsibility impacts a custody assessment, Brandt responded, "It wouldn't affect the test results. It may be something I would want to know more about. It certainly would affect my judgment as far as the stability of the person." When asked if a person's failure to pay a child support obligation for seven years would cause him concern, Brandt replied, "It would, definitely. Any time anybody doesn't meet their obligations it is a matter of concern." Dr. James Wahlberg, a professor in social work, who prepared an evaluation of Robert's fitness as a parent, also testified it would cause him concern if a parent failed to fulfill child support

---

2. Robert had a son by a previous marriage, Blake, who he admittedly has lost contact with. Robert had a $100 monthly child support obligation for that child, of which he only paid $900 from the divorce in May of 1986 until June of 1994. Robert only began making payments after enforcement proceedings were brought against him.

3. There were allegations that Kelly was seeing another man, a relationship she ended prior to its elevating to an affair. Kelly also voluntarily underwent treatment for alcohol abuse.

obligations and failed to maintain contact with a non-custodial child.

[¶ 12] Robert's relationship and child support obligation to Blake is relevant to his disposition to provide for Robbi. Even if it does not fit squarely within subsection c, it certainly is a factor which may be considered by the trial court under subdivision m. Section 14–09–06.2(1)(m), N.D.C.C., states: "Any other factors considered by the court to be relevant to a particular child custody dispute." The trial court's findings are not clearly erroneous, as they are supported by the evidence.

[¶ 13] Robert argues he should be awarded custody because he has been Robbi's primary caretaker, and he meets the best interests standard to be awarded custody. We disagree.

[¶ 14] Robert concedes N.D.C.C. § 14–09–06.2 provides no reference to a "primary caretaker," and the designation has never gained a presumptive status in this state. *Reimche,* 1997 ND 138, ¶ 45, 566 N.W.2d 790 (Meschke, J., dissenting). Former Justice Beryl J. Levine often advocated the use of the primary caretaker status to break the tie between two otherwise equally fit parents. *Weber,* 512 N.W.2d at 729 (Levine, J., concurring in result). Here, the trial court found both parents to be fit, but not equally fit, as evidenced by the trial court's finding Robert's relationship with Blake was a negative factor against him.

[¶ 15] Even if we were to elevate primary caretaking to a presumptive status, Robert has not shown he is entitled to the status. Nowhere in its findings did the trial court refer to Robert as Robbi's "primary caretaker." The trial court recognized Robert performed a significant role in Robbi's care. In its finding, the court stated: "The Court finds each party has been a good parent to their son. The Plaintiff has been primarily a 'stay at home dad' while the Defendant has been employed full-time with the United States Air Force for the majority of the marriage."

[¶ 16] A primary caretaker is identified as: " 'the parent who provides the child with daily nurturance, care and sup-

port. For example, the following have been held to be indicia of primary caretaker status: (1) preparing and planning meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning and care of clothing; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers; (6) arranging alternative care, i.e., babysitting, day-care; (7) putting child to bed at night, waking child in the morning; (8) disciplining child, i.e., teaching general manners and toilet training; (9) educating, i.e., religious, cultural, social, etc.; (10) teaching elementary skills, i.e., reading writing and arithmetic....' " *Reimche,* 1997 ND 138 at ¶ 46, 566 N.W.2d 790 (quoting *Gravning v. Gravning,* 389 N.W.2d 621, 624, n. 1 (N.D.1986) (Levine, J., dissenting)). There may not always be a "primary caretaker" in every case. *See* Marcia O'Kelly, *Blessing the Tie That Binds: Preference for the Primary Caretaker as Custodian,* 63 N.D. LAW REV., 481, 484 n. 10 (recognizing neither parent is a primary caretaker if there has been substantial co-parenting). In *Dalin v. Dalin,* 512 N.W.2d 685, 688 (N.D.1994), we affirmed the trial court's finding that neither parent was the primary caretaker when one parent had custody approximately seventy percent of the time. We observed, "deciding which, if either, is primary caretaker may involve more than a mathematical computation of the days spent in each parent's care, custody and control." *Id.* Likewise, in *Bashus v. Bashus,* 393 N.W.2d 748, 752 (N.D.1986), we stated, "there is more to being a primary caretaker than the time spent in primary care."

[¶ 17] Here, Robert and Kelly's parental involvement evidences extensive co-parenting, even if Robert spent more time with Robbi. While Kelly worked full time, she often worked twelve hour shifts, giving her several consecutive days off. On her days off, and in the evenings, Kelly cared for Robbi. The record is replete with evidence of both parents' involvement in Robbi's caretaking. For every factor associated with the role of primary caretaker, evidence in the record supports that both parents jointly shared those responsibilities. We do not believe the trial court erred by not designating

Robert as the primary caretaker, even though he was a "stay-at-home dad."

[¶ 18] Robert asserts he is being treated unfairly because he is a man in a non-traditional role. "Gender bias in judicial proceedings is wholly unacceptable." *Dalin,* 512 N.W.2d at 689. We will not condone trial courts perpetuating damaging stereotypes based on gender. *Id.* However, upon review, nothing in the record reflects any gender bias by the trial court against Robert.

[¶ 19] In *Porter v. Porter,* 274 N.W.2d 235 (N.D.1979), we considered a custody dispute similar to the Hogues, except the genders were reversed. The *Porter* case involved a custody dispute between two fit parents, where the mother decided to forego a career to remain home to care for the household and the children, while her husband advanced in his military career. *Id.* at 241–42. The mother claimed it was unfair for the trial court to award custody to her husband, after all she had sacrificed to benefit the family. *Id.* In affirming the trial court's custody award of the children to the father, we held: "Fairness to the parents, however, is not the test but rather what is in the best interests of the children." *Id.* at 242.

[¶ 20] The record reflects both parents were fit and were active in Robbi's care—good parents, making this a difficult decision in a close case. Because there is evidence in the record to support the trial court's findings, we cannot say the trial court erred by placing custody with Kelly.

### CHILD SUPPORT

[¶ 21] Robert argues the trial court erred in its child support award by failing to recognize his multiple support obligation. We agree.

[¶ 22] Child support determinations are findings of fact, governed under the "clearly erroneous" standard of review. *Hieb v. Hieb,* 1997 ND 171, ¶ 6, 568 N.W.2d 598. A finding is "clearly erroneous" if, after a review of the entire record, the finding was induced by an erroneous view of the law, or if this court is left with a definite and firm conviction a mistake has been made. *Id.* at ¶ 6. Child support determinations are gov-

erned by N.D.A.C. ch. 75–02–04.1. Section 75–02–04.1–06.1, N.D.A.C., requires the trial court to consider an obligor's multiple obligations to pay child support when determining the appropriate child support obligation. Using Schedule C, a worksheet to calculate child support when there are multiple obligees, it is clear the trial court erred in determining the amount of Robert's obligation. Because the trial court's child support calculation is clearly erroneous, we reverse and remand, instructing the court to impose the $229 monthly child support obligation as required by the guidelines.

### SPOUSAL SUPPORT

[¶ 23] Robert argues the trial court erred in failing to award rehabilitative spousal support.

[¶ 24] Determinations of spousal support are findings of fact, and the trial court's determination will not be set aside unless it is clearly erroneous. *Orgaard v. Orgaard,* 1997 ND 34, ¶ 5, 559 N.W.2d 546. A finding is clearly erroneous only if it is induced by an erroneous view of the law, if there is no evidence to support a finding, or if, although there is some evidence to support it, on the entire evidence, we are left with a firm conviction a mistake has been made. *Van Klootwyk v. Van Klootwyk,* 1997 ND 88, ¶ 13, 563 N.W.2d 377.

[¶ 25] When making a spousal support determination, the trial court must consider the relevant factors under the *Ruff–Fisher* guidelines. *Lohstreter v. Lohstreter,* 1998 ND 7, ¶ 25, 574 N.W.2d 790. Considered under the *Ruff–Fisher* guidelines are: " 'the respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material.' " *Van Klootwyk,* 1997 ND 88, ¶ 14, 563 N.W.2d 377, (quoting *Weir v. Weir,* 374 N.W.2d 858, 862 (N.D.1985)).

The trial court is not required to make specific findings, but it must specify a rationale for its determination. *Id.* at ¶ 14; *see also Wolf v. Wolf,* 557 N.W.2d 742, 744 (N.D. 1996).

 [¶ 26] The trial court's findings did not mention the *Ruff–Fisher* guidelines. The only finding on spousal support states: "The Court finds that neither party is entitled to spousal support in this case." The trial court has not given any rationale for its finding. It appears Robert may have been disadvantaged by the marriage—by the many moves due to Kelly's military career and by being primarily a stay-at-home dad.

[¶ 27] The record reflects Robert is working full time as a sales clerk at Menards. Although Robert has completed an associate degree in electro-mechanical drafting, this does not eliminate the possibility he may be in need of rehabilitation. *See Lohstreter,* 1998 ND 7, ¶ 25; *Van Klootwyk,* 1997 ND 88, ¶ 16, 563 N.W.2d 377. This case requires further consideration of the spousal support issue. Because the trial court did not adequately give a rationale for denying spousal support, we reverse and remand for further consideration and explanation.

## ATTORNEY FEES

[¶ 28] Robert argues the trial court abused its discretion in awarding him only $800 in attorney fees. We disagree.

[¶ 29] The trial court has discretion under N.D.C.C. § 14–05–23, in awarding attorney fees. We will not disturb the trial court's decision regarding attorney fees on appeal unless the party affirmatively establishes an abuse of discretion. *Cermak v. Cermak,* 1997 ND 187, ¶ 20, 569 N.W.2d 280; *Lill v. Lill,* 520 N.W.2d 855, 858 (N.D.1994); *Jondahl v. Jondahl,* 344 N.W.2d 63, 73 (N.D. 1984).

[¶ 30] The trial court, in awarding attorney fees, must balance one party's need against the other party's ability to pay. *Cermak,* 1997 ND 187, ¶ 20, 569 N.W.2d 280; *Lill,* 520 N.W.2d at 858. The parties here had little property to divide, and both were burdened with a substantial amount of debt.

By awarding attorney's fees to Robert, it appears the trial court did consider the disparity of the parties' incomes. Robert has failed to show us how the trial court abused its discretion in awarding him $800 toward his attorney's fees. We affirm the trial court's determination of attorney fees.

## CONCLUSION

[¶ 31] We affirm the trial court's determination of the custody and attorney fee awards, modify the child support award, and reverse and remand the spousal support determination for further proceedings consistent with this opinion.

[¶ 32] VANDE WALLE, C.J., MARING, J., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

SANDSTROM, J., concurs in the result.

[¶ 33] RALPH J. ERICKSTAD, Surrogate Judge, sitting in place of MESCHKE, J., disqualified.

