1999 ND 63

**Robert REEVES, Plaintiff and Appellee**

v.

**Karen CHEPULIS, Defendant and Appellant**

No. 980220.

Supreme Court of North Dakota.

April 6, 1999.

Timothy W. McCann, of Lindquist, Jeffrey & Jensen, East Grand Forks, MN, for defendant and appellant.

John Thomas Traynor, Jr. (argued) and Daniel M. Traynor, of Traynor, Rutten & Traynor, Devils Lake, for plaintiff and appellee.

MARING, Justice.

[¶ 1] Karen Chepulis appeals the district court's judgment awarding physical custody of Michael Reeves to his father Robert Reeves. We affirm.

I

[¶ 2] Michael Reeves, born on February 26, 1995, is the child of Robert Reeves and Karen Chepulis. Michael's parents, who never were married and were 16 years old when Michael was born, ended their relationship within a year of Michael's birth. Both paternal and maternal grandparents have been very involved in raising and caring for Michael throughout his life. As Karen acknowledged in her brief, "Michael has lived at different times in both sets of grandparents' homes, and they have had contact and relations with him on a daily basis." After Michael was born, there was no particular custody arrangement, both families just seemed to do their share. Michael primarily resided with Karen and/or her parents during the week and with Robert and his parents on the weekend.

[¶ 3] After graduating from high school, Robert completed a two-year welding program at the North Dakota State College of Science in Wahpeton, North Dakota, in April 1998. Shortly thereafter, Robert began working for Melroe Company in Bismarck, where he earns approximately fifteen dollars per hour plus good benefits. During his two years in college, Robert failed on only three occasions to return to Devils Lake to visit and take care of his son. The district court described Robert as goal-oriented and ambitious. It found Robert to have matured faster than Karen. The guardian ad litum described Robert as a caring and concerned father.

[¶ 4] Since graduating from high school, Karen has worked off and on as a nurse's assistant in Devils Lake, earning on the average seven dollars per hour. She plans to attend nursing school in Bismarck in the future. Karen became pregnant again in 1996 as a result of a brief relationship with another man. The baby was born in February 1997 and was given up for adoption shortly after. Since Michael's birth, Karen's living arrangements have changed often. Review of her testimony at the custody hearing reveals in the past three years she has been in and out of her own apartment two or three times, in and out of her parent's home as many times, lived with Robert's parents once for a short period, and since early 1998 has been living in rural Devils Lake with John Olson, whom she recently married. The guardian ad litum was "not completely comfortable with some of the choices that Karen has made," but also concluded she has "shown more maturity lately" in her parenting role.

[¶ 5] In March 1997 the parties stipulated to a temporary physical custody and visitation schedule. The parties agreed to joint legal custody, with Karen having temporary physical custody. Under the custody arrangement, Michael was shuffled between Karen, her parents, Robert and his parents, and a day-care provider throughout the week. Generally, Michael spends time either at day-care, with Karen, or with Karen's parents during the week, and spends the weekend with Robert and his parents. The parties' testimony at the custody hearing reveals Michael spent approximately 21 hours at day-care, 70 hours with Karen, 12 hours with Karen's parents, and 65 hours with Robert and his parents during a typical week.

[¶ 6] Michael is in good health physically. However, the guardian ad litum reported Michael as having some social problems for a child his age, such as biting, kicking, aggressiveness, and tantrums. Michael's day-care provider suggested his problems stem from his unstructured schedule, and felt Michael's tantrums and aggressiveness would subside if he had more routine in his daily schedule, such as his naptime, mealtime, and bedtime.

[¶ 7] On July 25, 1997, Robert brought an action seeking physical custody of his son. At the hearing on April 29, 1998, the district court determined Michael most needed stability, permanence, and continuity in his home environment. The court concluded Robert could provide more continuity in the child's life with his job and schedule in Bismarck. The court delayed the actual change in physical custody until September 1, 1998, because Robert had recently started his job in Bismarck and because Michael needed time to adjust to the decision. Karen timely appealed from the judgment entered on May 20, 1998.

## II

[¶ 8] Karen argues the district court erred in awarding physical custody of their son to Robert. In *Reimche v. Reimche*, 1997 ND 138, ¶ 12, 566 N.W.2d 790 (citations and internal quotations omitted), we summarized our limited review of a trial court's custody award under N.D.R.Civ.P. 52(a):

A trial court's custody determination is a finding of fact that will not be set aside on appeal unless it is clearly erroneous. A trial court's findings of fact are presumptively correct. The complaining party bears the burden of demonstrating on appeal that a finding of fact is clearly erroneous. In reviewing findings of fact, we must view the evidence in the light most favorable to the findings. A choice between two permissible views of the evidence is not clearly erroneous. Simply because we might view the evidence differently does not entitle us to reverse the trial court. A finding of fact is clearly erroneous only if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.

[¶ 9] Karen argues the district court erred because it did not make detailed factual findings on the issue of domestic violence. At the custody hearing, Karen testified to one account of domestic violence during her relationship with Robert:

The one night after we'd broken up, I got very scared of him. He came up to my sister, Nicole's apartment, ... and he knocked on the door and I answered and he said he had come to return some beer that he had borrowed from Nicole the night before. I said, okay, put it in the fridge. Well, he did this and then he started walking out and then he stopped and he wanted to talk about Michael, which is fine. Well, he got mad at me and we got into a big argument in which I got pushed a couple of times. I asked him to leave and he walked out and he decided to come back in and in the process of that he did break my sister's door to the apartment. I called his mother, told her what was going on, told her to come and get him and that pretty much ended it.

Karen's account of this incident was the only admissible evidence presented on the domestic violence issue. The issue was not addressed at any other point during the custody hearing, the parties did not address the issue in their closing arguments, and the trial court did not address the allegation in its oral or written factual findings or conclusions of law.

[¶ 10] In an initial custody determination, a trial court must decide custody on the best interests and welfare of the child. *Severson v. Hansen*, 529 N.W.2d 167, 168 (N.D.1995). In so doing, the trial court has substantial discretion, but it must consider all of the factors under the best interests statute, N.D.C.C. § 14–09–06.2(1)(a)–(m). *Id.* at 168–69. While a separate finding is not required for each statutory factor, "the court's findings should be stated with sufficient specificity so that we can understand the factual basis for its decision." *Id.* at 169.

[¶ 11] A trial court's evaluation of evidence of domestic violence in a custody determination is guided by subsection (j) of N.D.C.C. § 14–09–06.2(1). Section 14–09–06.2(1)(j) was amended in 1993 to create a rebuttable presumption against awarding custody to a parent who had perpetrated domestic violence when the court found "credible evidence that domestic violence has occurred." *See* 1993 N.D. Sess. Laws ch. 144, § 2. In 1997 the Legislature amended the statute again, raising the level of domestic violence required to trigger the presumption. *See* 1997 N.D. Sess. Laws ch. 147, § 2. The presumption is now triggered when the trial court finds: "credible evidence that domestic violence has occurred, and there exists one incident of domestic violence which resulted in serious bodily injury or involved the use of a dangerous weapon or there exists a pattern of domestic violence within a reasonable time proximate to the proceeding." *Id.; see Dinius v. Dinius*, 1997 ND 115, ¶ 18, 564 N.W.2d 300 (discussing the effect of the 1997 amendment).

[¶ 12] Once the presumption under section 14–09–06.2(1)(j) is triggered, the issue of domestic violence becomes the "paramount factor" in the trial court's custody

decision. *Engh v. Jensen,* 547 N.W.2d 922, 924 (N.D.1996). The presumption prevents an abusive parent from obtaining custody of the child unless the abusive parent proves " 'by clear and convincing evidence that the best interests of the child require' " the abusive parent to participate in or have custody. *Id.* (citing N.D.C.C. § 14–09–06.2(1)(j)); *see also Zuger v. Zuger,* 1997 ND 97, ¶ 31, 563 N.W.2d 804.

[¶ 13] Karen concedes the evidence of domestic violence presented to the trial court did not result in serious bodily injury, involve use of a dangerous weapon, or constitute a pattern of violence, and therefore did not trigger the presumption under N.D.C.C. § 14–09–06.2(1)(j). She argues, however, a trial court must make specific factual findings even when the evidence of domestic violence does not rise to the level of triggering the presumption, and the trial court's failure to do so compels reversal. We disagree.

[¶ 14] The import of domestic violence in a child custody proceeding is evidenced by the statute's requirement that the trial court "cite specific findings of fact to show that the custody or visitation arrangement best protects the child and the parent or other family or household member who is the victim of domestic violence." N.D.C.C. § 14–09–06.2(1)(j). When a trial court addresses whether or not evidence of domestic violence triggers the presumption under N.D.C.C. § 14–09–06.2(1)(j), we require the court to make specific and detailed findings regarding the effect the allegations of domestic violence have on the presumption. *Kasprowicz v. Kasprowicz,* 1998 ND 68, ¶ 13, 575 N.W.2d 921. In *Kasprowicz,* the trial court was presented with several allegations

of domestic violence. Although the court recited the various allegations of domestic violence in its findings of fact, it was unclear to us "what conclusion the [trial] court reached regarding the ... presumption." *Id.* at ¶ 12. We reversed and remanded the custody determination because of the "court's lack of a conclusion as to the effect of these allegations on the domestic violence presumption." *Id.* at ¶ 13. We require specific factual findings and conclusions regarding the presumption so we are not left guessing as to the trial court's reasoning for applying or not applying the presumption.[1]

[¶ 15] Yet there is no question, as Karen concedes, the evidence of domestic violence presented to the trial court did not trigger the presumption under N.D.C.C. § 14–09–06.2(1)(j). Evidence of domestic violence becomes the "paramount factor" in the trial court's custody decision when the statutory presumption is triggered. *Engh,* 547 N.W.2d at 924. Evidence of domestic violence which clearly does not trigger the presumption, however, certainly remains one of the best interest factors to be considered under N.D.C.C. § 14–09–06.2. *See Zimmerman,* 1997 ND 182, ¶ 7, 569 N.W.2d 277 (citing *Huesers v. Huesers,* 1997 ND 33, ¶ 7, 560 N.W.2d 219) (stating "[a]lthough domestic violence is just one of many factors a trial court must review when determining the best interests of a child, in the hierarchy of factors to be considered, domestic violence predominates [once the presumption is triggered]"); *see also Ramstad v. Biewer,* 1999 ND 23, ¶ 21, 589 N.W.2d 905 (concluding although the evidence of "domestic violence did not give rise to a presumption against custody, their proximity to each other and to

---

1. In a similar vein, we require trial courts to make specific findings regarding the presumption when evidence of reciprocal domestic violence is presented in a custody proceeding. While section 14–09–06.2(1)(j) does not specifically set forth a procedure for addressing reciprocal domestic violence, we have said the trial court must "measure the amount and extent of domestic violence inflicted by both parents[,]" and "make detailed findings" determining whether the presumption arises as to one parent or not at all. *Krank v. Krank,* 529 N.W.2d 844, 850 (N.D.1995). Because of the more detailed analysis necessarily involved in determining

which parent may get the presumption when reciprocal abuse is alleged, we require a trial court to focus its findings more carefully and specifically on the degree of violent behavior by each parent. *See Zimmerman v. Zimmerman,* 1997 ND 182, ¶ 9, 569 N.W.2d 277 (reversing because the trial court failed to "carefully delineate relevant and specific facts" relating to evidence of domestic violence by both parents); *Owan v. Owan,* 541 N.W.2d 719, 722–23 (N.D. 1996) (reversing because the "trial court failed to measure or weigh the violent conduct ... [or] the propensity of each of these parents for continued violence").

the proceeding makes them appropriate factors *for consideration in the custody determination*").

[¶ 16] Karen's testimony regarding the single incident of domestic violence by Robert, though clearly not sufficient to raise the presumption, undoubtably should have been considered along with the other relevant factors under N.D.C.C. § 14–09–06.2. While the trial court failed to specifically address the allegation in its factual findings, we do not require a separate finding for each statutory factor under N.D.C.C. § 14–09–06.2 provided we can understand the factual basis for the court's decision. *Severson,* 529 N.W.2d at 169; *see also Loll v. Loll,* 1997 ND 51, ¶ 9, 561 N.W.2d 625 (although we ordinarily remand for clarification of missing or conclusory factual findings, we will not do so when, through inference or deduction, we can discern the rationale for the result reached by the trial court). In its oral findings, the trial court reviewed nearly all of the statutory factors under N.D.C.C. § 14–09–06.2 and clearly decided Michael most needed stability, permanence, and continuity in his life. We cannot say the court's decision that this would best be served by granting physical custody to Robert is clearly erroneous.

### III

[¶ 17] Karen also argues the trial court erred by concluding she was not Michael's primary caretaker. Although the primary caretaker rule has not been given presumptive status in this state, it remains a relevant factor to be considered by the trial court in its review of the statutory factors under N.D.C.C. § 14–09–06.2. *Schneider v. Livingston,* 543 N.W.2d 228, 230 (N.D.1996); *Gravning v. Gravning,* 389 N.W.2d 621, 622 (N.D.1986) (stating the primary caretaker rule "inheres in the statutory factors and has not yet been accorded elevated status"). The primary caretaker is generally the parent who provides the child with daily nurturance, care and support—the following activities have been held to be indicia of primary caretaker status: "(1) preparing and planning meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning and care of clothing; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers; (6) arranging alternative care, i.e., babysitting, day-care; (7) putting child to bed at night, waking child in the morning; (8) disciplining child, i.e., teaching general manners and toilet training; (9) educating, i.e., religious, cultural, social, etc.; [or] (10) teaching elementary skills, i.e., reading[,] writing and arithmetic . . . ." *Hogue v. Hogue,* 1998 ND 26, ¶ 16, 574 N.W.2d 579 (citations omitted).

[¶ 18] "There may not always be a 'primary caretaker' in every case." *Id.* (citing Marcia O'Kelly, *Blessing the Tie That Binds: Preference for the Primary Caretaker as Custodian,* 63 N.D.L .Rev. 481, 484 n. 10 (recognizing neither parent is a primary caretaker if there has been substantial co-parenting)). In *Hogue,* we affirmed a trial court's finding that neither parent was the primary caretaker even when the child spent more time with the father, who was a "stay-at-home-dad." *Id.* at ¶ 17. We noted "[t]he record is replete with evidence of both parents' involvement in [the child's] caretaking. For every factor associated with the role of primary caretaker, evidence in the record supports that both parents jointly shared those responsibilities." *Id.* Similarly, in *Dalin v. Dalin,* 512 N.W.2d 685, 688 (N.D.1994), the trial court found neither parent was the primary caretaker even where the child was in the father's custody approximately seventy percent of the time. We affirmed the trial court's finding that neither parent had permanence as a family unit because of the child's alternating custody schedule and constant shuffling between families since the divorce. *Id.* ("deciding . . . primary caretaker [status] may involve more than a mathematical computation of the days spent in each parent's care, custody and control").

[¶ 19] When considering the primary caretaker status in this case, the trial court initially examined Michael's weekly schedule. The court found in a typical week Michael shuffled between Karen, her parents, Robert and his parents, and a day-care provider. The amount of time Michael spent with Karen, Robert, and their parents was approximately equal, but the court noted "Robert does spend most of the time directly with his

son when he [is] home" on the weekends. Karen argues the trial court erred because it merely counted the hours each parent spent with Michael. While the court initially focused on Michael's weekly schedule, the court's oral findings correctly reflect the proper analysis for the primary caretaker determination:

> I don't think we really [have a primary caretaker] if you're just looking at hours which isn't the only factor of a primary caregiver. Decision making, doing things and involvement is really what it's about, but I don't think there really is a real clear primary caregiver and so that isn't a great factor in my determination.

Moreover, while not directly addressed in the trial court's findings, the transcript of the hearing is replete with questions by the court concerning Michael's daily care and support such as his feeding, bathing, and grooming. We are confident the trial court considered the proper factors in its assessment of the primary caretaker status, and we cannot say the court's finding neither parent to be primary caretaker is clearly erroneous.

## IV

[¶ 20] As a final matter, we address portions of Karen's brief and appendix which violate our rules of appellate procedure. N.D.R.App.P. 30(a) mandates: "Only items actually in the record may be included in the appendix. A signature on the brief, under Rule 28 certifies compliance with this rule." The appendix submitted and certified by Karen's attorney, contains three documents not included in the record below. The brief submitted and certified by the attorney is replete with references to these documents as well. This obvious violation of our appellate rules of procedure was subsequently pointed out by Robert's counsel in his appellate brief. Although the attorney had the opportunity to take corrective action prior to oral argument, he failed to do so. When we pointed out the violations to the attorney at oral argument and reminded him of the ethical obligations which are the basis of the rules, he insisted the documents, while not before the trial court below, were nevertheless relevant to our determination on appeal. The attorney's failure to remedy the situation when the violation was pointed out to him and insistence at oral argument the documents remained relevant to our determination is a serious and wilful violation of the rules of appellate procedure.

[¶ 21] N.D.R.App.P. 13 provides: "The supreme court may take any appropriate action against any person failing to perform an act required by the rules or required by court order." We apply this rule "as an enforcement tool to encourage compliance with the North Dakota Rules of Appellate Procedure ... [and] '[t]he determination whether to administer sanctions for noncompliance with [these Rules] rests wholly within the discretion of this court.'" *Hurt v. Freeland*, 1997 ND 194, ¶¶ 12, 13, 569 N.W.2d 266 (citations omitted). At oral argument, the attorney, finally at our suggestion, orally moved the Court to strike the extra documents in his appendix and all references made to them in his brief. We grant the motion and impose costs against attorney McCann, personally, for twice the amount of Robert's costs on appeal.

[¶ 22] The judgment of the district court awarding physical custody of Michael Reeves to his father Robert Reeves is affirmed.

[¶ 23] VANDE WALLE, C.J., and NEUMANN, SANDSTROM and KAPSNER, JJ., concur.