1999 ND 149

**Kurt W. SCHUMACHER, Plaintiff and Appellant,**

v.

**Coreen D. SCHUMACHER, Defendant and Appellee.**

**No. 990016.**

Supreme Court of North Dakota.

July 29, 1999.

Maureen Holman, Serklund, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, for plaintiff and appellant.

Coreen D. Schumacher, pro se.

VANDE WALLE, Chief Justice.

[¶ 1] Kurt W. Schumacher appealed from a divorce judgment which distributed property, placed the parties' minor child in Coreen D. Schumacher's custody, and ordered Kurt to pay rehabilitative spousal support and child support. We affirm the district court's custody and child support awards and, because of the lack of evidence, we reverse and remand the award of rehabilitative spousal support for further consideration.

I

[¶ 2] Coreen moved from Glendive, Montana to Minot, North Dakota in 1992. Coreen and Kurt married in May 1992. Immediately prior to the marriage, the parties executed a prenuptial agreement. The prenuptial agreement stated Kurt owned real estate valuing $388,000 and investments in the amount of $115,185. According to Coreen, Kurt would not marry her if she would not sign the agreement. Their daughter, Morgan, was born about one month later.

[¶ 3] Kurt has worked as a locomotive engineer with the Burlington Northern Santa Fe Railroad for twenty years. His salary is approximately $42,000 per year and he receives health, dental and vision insurance which covers Morgan through his employer. He owns a 4 bedroom home in Minot.

[¶ 4] Coreen is presently employed as an assistant manager for a gas station in Vaughn, Montana. She makes approximately $12,000 per year, and after 6 months of employment will receive benefits. She resides in a trailer house owned by her mother. During most of the parties' marriage, Coreen worked full time and her income was used to pay the family's living expenses. Kurt gave Coreen about $50 every two weeks for groceries.

[¶ 5] The parties separated in August 1994. An interim order issued by the district court allowed Coreen, Morgan and Bryson, Coreen's son from a previous marriage, to live in the marital home. They lived in the marital home from August 1994 until February 1995. During this time, a neighbor, Jennifer Vang, described Morgan as being shy and thin. She further stated Morgan's clothes were dirty and she had dark circles under her eyes. Laurie Sveen, Morgan's daycare provider at this time, also stated Morgan had dark circles under her eyes, but her clothes were always clean and she ate well. Sveen believes Morgan looks healthier since she has been under Kurt's care. Both Vang and Sveen testified Coreen would leave Morgan and Bryson, aged 9, unattended.

[¶ 6] Coreen moved from the marital home because she believed her being there upset Kurt. She purchased a house in Minot, but lost it to foreclosure. She then moved into an apartment. Two of Coreen's neighbors while she resided at the apartment were Jacqueline Johnson and Bonnie Sasse. According to Johnson and Sasse, Morgan was well-kept and fed while in the care of Coreen. Johnson witnessed an incident between Kurt and Coreen when she went with Coreen to get Morgan for visitation. When Coreen and Johnson arrived at Kurt's home, Kurt's mother held Morgan refusing to let her go to Coreen. Kurt grabbed Coreen's arm and put his arm up against her throat choking her.

[¶ 7] In August 1997, Coreen moved to Vaughn, Montana with Bryson and Morgan. Coreen wanted to move back to Montana to attend college. Coreen wants to become a licensed practical nurse and obtain a degree in occupational therapy. Coreen stated she did not attend college in Minot because Kurt would not financially assist her, and his income was too high for her to qualify for a loan or grant.

[¶ 8] Kurt filed for divorce September 23, 1997. Coreen filed an answer and counterclaim seeking a divorce, custody of Morgan, child support and division of the parties' property and debts. October 23, 1997, the district court issued an order awarding temporary custody of Morgan to Kurt pending final resolution of the case, with reasonable visitation for Coreen. The trial court found that while Kurt has had temporary custody of Morgan, he and his parents have been uncooperative and tried to frustrate visitation by Coreen. Kurt hired a live-in nanny to help care for Morgan and has enrolled her in kindergarten.

[¶ 9] Anne–Kristen Partlow was appointed guardian ad litem. After conducting an investigation, she issued a report recommending custody be awarded to Kurt. In her report, Partlow states there is nothing to substantiate Coreen's allegations of domestic abuse by Kurt.

[¶ 10] A trial was held June 19, 1998 and continued on September 30, 1998. Both parties presented evidence concerning domestic violence. Coreen and Bryson testified about an incident which took place shortly after the parties' marriage when she was pregnant with Morgan. Attempting to take the wedding ring from Coreen, Kurt forced Coreen to the ground with his knee in her ribs. He bruised her eye and arms, and tore hair from her head. Kurt also grabbed Bryson by the hair to stop

him from calling 911. Coleen Shipp testified she saw the effects of this abuse. Coreen testified about another incident in which Kurt dragged her down a hallway after a pushing match. Coreen further testified Kurt came home intoxicated one evening and literally kicked her out of the bed.

[¶ 11] Kurt also presented evidence of domestic violence by Coreen. He testified that in the fall of 1993, Coreen hit him when she became upset. He called the police, but no arrests were made. Kurt also stated he has slapped Coreen a couple of times in self-defense. Kurt presented a letter written by Coreen, before the parties were married, in which she apologizes for slapping him.

[¶ 12] Kurt submitted a joint property and debt listing to the district court which lists the value of his real estate at $305,000 and his investments at $56,958. There is great disparity between the valuation of Kurt's assets at the time of trial compared with the prenuptial valuation in 1992. Neither Kurt or Coreen presented any evidence concerning the amount of income Kurt's investments produce.

[¶ 13] The district court awarded custody of Morgan to Coreen. The judgment ordered Kurt to pay child support in the amount of $701 per month and $500 per month in rehabilitative spousal support for 120 months or until Coreen remarried.

II

[¶ 14] Kurt argues the district court's custody determination is erroneous because the Court incorrectly analyzed the evidence concerning domestic violence.

[¶ 15] This Court will not disturb a child custody determination unless it is clearly erroneous. *Kasprowicz v. Kasprowicz*, 1998 ND 68, ¶ 11, 575 N.W.2d 921. A finding of fact is clearly erroneous if it is not supported by the evidence, if it is induced by an erroneous view of the law, or if the district court is left with the definite and firm conviction that a mistake has been made. *Id.*

[¶ 16] In an initial custody determination, a trial court must decide custody in the best interests and welfare of the child. *Reeves v. Chepulis*, 1999 ND 63, ¶ 10, 591 N.W.2d 791. In doing so, the trial court must consider all factors under the best interests statute, section 14–09–06.2(1)(a)–(m), N.D.C.C. *Id.* A separate finding is not required for each statutory factor, but "the court's findings should be stated with sufficient specificity so that we can understand the factual basis for its decision." *Id.* (quoting *Severson v. Hansen*, 529 N.W.2d 167, 168 (N.D.1995)).

[¶ 17] N.D.C.C. § 14–09–06.2(1)(j) guides trial court's in their evaluation of domestic violence evidence in a custody determination. *Id.* We have explained the domestic violence presumption in recent cases:

Section 14–09–06.2(1)(j) was amended in 1993 to create a rebuttable presumption against awarding custody to a parent who had perpetrated domestic violence when the court found "credible evidence that domestic violence has occurred." *See* 1993 N.D. Sess. Laws ch. 144, § 2. In 1997 the Legislature amended the statute again, raising the level of domestic violence required to trigger the presumption. *See* 1997 N.D. Sess. Laws ch. 147, § 2. The presumption is now triggered when the trial court finds: "credible evidence that domestic violence has occurred, and there exists one incident of domestic violence which resulted in serious bodily injury or involved the use of a dangerous weapon or there exists a pattern of domestic violence within a reasonable time proximate to the proceeding." *Id.; see Dinius v. Dinius*, 1997 ND 115, ¶ 18, 564 N.W.2d 300 (discussing the effect of the 1997 amendment).

Once the presumption under section 14–09–06.2(1)(j) is triggered, the issue of domestic violence becomes the "para-

mount factor" in the trial court's custody decision. *Engh v. Jensen*, 547 N.W.2d 922, 924 (N.D.1996). The presumption prevents an abusive parent from obtaining custody of the child unless the abusive parent proves "by clear and convincing evidence that the best interests of the child require" the abusive parent to participate in or have custody. *Id.* (citing N.D.C.C. § 14–09–06.2(1)(j)); *see also Zuger v. Zuger*, 1997 ND 97, ¶ 31, 563 N.W.2d 804.

*Holtz v. Holtz*, 1999 ND 105, ¶ 27, 595 N.W.2d 1 (quoting *Reeves*, at ¶¶ 11–12). If the evidence of domestic violence is insufficient to trigger the presumption, it nevertheless remains one of the best-interest factors to be considered by the court under N.D.C.C. § 14–09–06.2. *Id.*

[¶ 18] The trial court, in its findings of fact, recited the incidents of domestic violence committed by both Coreen and Kurt and stated: "I find that neither party made any untrue allegation of domestic violence against the other." However, the court determined only the domestic violence of Kurt invoked the rebuttable presumption: "There is credible evidence of domestic violence which resulted in serious bodily injury and there exists a pattern of domestic violence within a reasonable time proximate to the proceeding committed by Kurt." The district court's findings support this conclusion. The court details four incidents of domestic violence by Kurt. Furthermore, the court describes the serious bodily injury which occurred when Kurt attempted to take the wedding ring from Coreen's finger, including, the bruised eye and arms and torn hair from Coreen's head.

[¶ 19] Kurt contends that if domestic violence has been committed by both parents, the trial court is obligated to measure the amount and extent of the domestic violence inflicted by both parents, citing *Krank v. Krank*, 529 N.W.2d 844 (N.D. 1995). According to Kurt, the district court made no specific findings with respect to the domestic violence committed by Coreen.

[¶ 20] When a trial court addresses whether the evidence of domestic violence triggers the domestic violence presumption, we require the court to make specific and detailed findings regarding the effect the allegations of domestic violence have on the presumption. *Holtz*, at ¶ 27. However, specific factual findings are not required when the evidence of domestic violence does not rise to the level triggering the presumption. *Id.* (citing *Reeves*, at ¶¶ 13, 16). The district court concluded that only Kurt's domestic violence invoked the presumption. Accordingly, the district court was not required to make specific factual findings regarding the effect the allegations of domestic violence by Coreen had on the presumption.

[¶ 21] The district court's child custody determination was not clearly erroneous.

### III

[¶ 22] Kurt contends the trial court improperly awarded rehabilitative spousal support to Coreen because she failed to provide notice of her intention to claim spousal support. He argues he had insufficient notice because Coreen's answer and counterclaim does not state she is seeking spousal support.

[¶ 23] Upon granting a divorce, the trial court may compel either party to pay spousal support. *Moilan v. Moilan*, 1999 ND 103, ¶ 9, 598 N.W.2d 81 (citing N.D.C.C. § 14–05–24; *Wetzel v. Wetzel*, 1999 ND 29, ¶ 20, 589 N.W.2d 889). Section 14–05–24, N.D.C.C., provides:

> When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to *make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just,*

having regard to the circumstances of the parties respectively.

(emphasis added). Kurt argues the present case is distinguishable from situations in which a person could assume that an issue of child support would be tied to an issue of custody, citing *Mathisen v. Mathisen*, 276 N.W.2d 123 (N.D.1979). We do not read *Mathisen* so narrowly. In *Mathisen*, this Court concluded the above statute, N.D.C.C. § 14–05–24, along with the husband's prayer for relief, in which he asked for a divorce and that he be granted custody of the parties' children, properly notified his spouse she might be ordered to provide support payments for the children. Similarly, N.D.C.C. § 14–05–24, along with Coreen's answer and counterclaim seeking a divorce, put Kurt on notice the court might address issues related to the divorce, including spousal support.

[¶ 24] Furthermore, the record indicates the issue of spousal support was tried to the court without objection. During the first day of trial, June 19, 1998, Coreen testified as follows:

Q. And you came here from Montana (to Minot) with the intention of going to college and never did?

A. Yeah, never got to go to college, it was always put on the back burner.

Q. What do you think the Judge ought to be compensating you?

A. Well, I really don't know. Monetary-wise I would like enough money to get going in school—$20,000.00, I guess to get going in school.

The second day of trial, Coreen further testified:

Q. Alright. What is your plan for your further education, what area are you looking at?

A. I'm going to finish and get my degree, you know, get an LPN and then occupational therapy.

Q. Okay. And where—you're not in school now, right?

A. No, I'm not.

Q. And have you explored, or have you gone down to the—where would you go, would you got (sic) to what school would it be?

A. It would be the University of Great Falls and then they have a satellite program out of Havre for the LPN.

Additional questions regarding Coreen's further education were asked upon cross examination, as well. Coreen testified:

Q. Okay. And then you want $20,000.00 from the court or from Mr. Schumacher to get yourself started and get yourself back going into school and that, correct?

A. Yes.

Q. You've been separated now for four years?

A. Yes.

Q. And during that four year period of time you never went back to school then?

A. No, I did not.

[¶ 25] An issue which is not properly raised in the pleadings but is tried by the express or implied consent of the parties will be treated in all respects as having been raised in the pleadings. *Check Control, Inc. v. Shepherd*, 462 N.W.2d 644, 648 (N.D.1990). N.D.R.Civ.P. 15(b) allows pleadings to be amended at any time to include issues not raised when those issues are tried by the express or implied consent of the parties. *Fleck v. Jacques Seed Co.*, 445 N.W.2d 649, 652 (N.D.1989). Under Rule 15(b), N.D.R.Civ. P., a pleading may be amended impliedly, by the introduction of evidence which varies the theory of the case and which is not objected to by the opposing party. *Id.*

[¶ 26] In *Napoleon Livestock Auction, Inc. v. Rohrich*, 406 N.W.2d 346, 357 (N.D.1987), we stated "[i]mplied consent is established where the parties recognized that the issue entered the case at trial and acquiesced in the introduction of evidence on that issue." Generally, a trial court's decision whether an issue was tried by express or implied consent is a matter

within the sound discretion of the trial court and will not be reversed on appeal unless an abuse of discretion is shown. *Id.* We believe the record shows the issue of spousal support entered the case at trial. Kurt did not object to questions regarding the distribution of money for Coreen's further education, but cross-examined Coreen on the issue the second day of trial. In view of the prenuptial agreement as to property, it is apparent Coreen was asking for spousal support. We, therefore, conclude the issue of rehabilitative spousal support was tried by the implied consent of the parties.

[¶ 27] In a related argument, Kurt contends the district court's spousal support award is not supported by the evidence in the record.

[¶ 28] Rehabilitative spousal support can be awarded not only to assist a disadvantaged spouse to achieve educational goals, but also to enable the disadvantaged spouse to achieve suitable and appropriate self support. *Duray v. Greenwood,* 1999 ND 126, ¶ 9, 596 N.W.2d 317; *Nefzger v. Nefzger,* 1999 ND 119, ¶ 23, 595 N.W.2d 583. A trial court's spousal support determination is treated as a finding of fact and will not be reversed unless it is clearly erroneous. *Riehl v. Riehl,* 1999 ND 107, ¶ 7, 595 N.W.2d 10.

[¶ 29] In making a determination of spousal support, trial courts consider the Ruff–Fischer guidelines, with respect to both *amount* and *duration. Id.* at ¶ 8 (emphasis added). These factors include: the respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material.

*Id.* While the trial court need not make specific findings as to each factor, we must be able to discern the trial court's rationale for its determination. *Id.*

[¶ 30] The trial court awarded Coreen rehabilitative spousal support in the amount of $500 per month for 10 years or until she remarries. The record reveals no basis for the duration or amount of the spousal support award to Coreen. In its Conclusions of Law, the district court appears to have applied the Ruff–Fischer guidelines in determining whether Coreen is entitled to rehabilitative spousal support. However, the evidence does not support the duration or amount of the award.

[¶ 31] While we conclude there was sufficient notice to raise the issue, we reverse the district court's award of rehabilitative spousal support and remand for further consideration of the duration and amount of the support. On remand, the trial court may receive further evidence on the issue of spousal support or may make further findings on the current record.

IV

[¶ 32] Kurt argues the district court erred in ordering him to pay child support in the amount of $701.00 per month because it improperly imputed his income. According to Kurt, there is no basis for the trial court's determination his monthly income from investments amounted to $2,000 per month.

[¶ 33] Child support determinations involve questions of law which are subject to the de novo standard of review, findings of fact which are subject to the clearly erroneous standard of review, and may, in some limited areas, be matters of discretion subject to the abuse of discretion standard of review. *Buchholz v. Buchholz,* 1999 ND 36, ¶ 11, 590 N.W.2d 215. As a matter of law, the trial court must clearly set forth how it arrived at the amount of income and level of support. *Id.* at ¶ 12. "A proper finding of net income is essential to a determination of the correct amount of child support under the

guidelines." *Id.* (quoting *Schleicher v. Schleicher*, 551 N.W.2d 766, 769 (N.D. 1996)).

[¶ 34] The Child Support Guidelines, N.D. Admin. Code § 75–02–04.1–01(7), base child support upon a calculation of gross and net income. In this case, the district court determined Kurt's gross annual income is $66,000. The court reached this figure by adding his annual salary of $42,000 to his investment income of $24,000 per year. In its conclusion of law, the district court explains how it determined the investment income: "Neither party bothered to present any evidence with regard to the amount of income that these investments produce. At passbook rates, I must assume that his investments should produce $2,000 per month in income."

[¶ 35] Under the present circumstances, we conclude the trial court's calculation of Kurt's income does not require reversal. N.D. Admin. Code § 75–02–04.1–02(7) states income must be documented through tax returns, current wage statements and other information sufficient to fully appraise the court of all gross income. Thus, a court's determination of an obligor's income is dependent upon the evidence presented by the parties. *See Anderson v. Anderson*, 504 N.W.2d 569, 571 (N.D.1993) (holding no reversible error where trial court had to choose between husband's incredible testimony as to value and wife's questionable method of determining value of husband's retirement).

[¶ 36] Coreen released her rights in any property owned by Kurt in a prenuptial agreement. Therefore, Kurt, not Coreen, has the information regarding the interest income from the investments listed in the prenuptial agreement and joint property and debt listing. Although Kurt has a responsibility to furnish the court with this information, N.D.R.Ct. 8.3(c)(1), he made no effort to do so. We refuse to let him "take advantage of his duplicity at the trial court level to urge error on appeal." *Id.*

[¶ 37] The district court's custody and child support awards are affirmed. We reverse and remand the award of rehabili-tative spousal support for further consideration.

[¶ 38] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and WILLIAM A. NEUMANN, JJ., concur.

SANDSTROM, Justice, concurring in part and dissenting in part.

[¶ 39] I would affirm the decision of the district court.

[¶ 40] The majority says, at ¶ 30, "the evidence does not support the duration or amount of the [spousal support] award." I respectfully disagree.

[¶ 41] Based on a prenuptial agreement, the court awarded Coreen Schumacher some items of personal property having apparently minimal value, and awarded Kurt Schumacher all the remaining property valued between $272,141 and $418,185. His annual income is $42,000 plus earnings from investments. Her annual income is $12,000. She needs additional education, which she will have to pursue while working and caring for the children. This evidence in the record is, in my judgment, more than sufficient to justify the spousal support awarded.

[¶ 42] Dale V. Sandstrom